Pennsylvania, Inc., National Electrical Contractors Association, Inc., Roofing and Sheet Metal Contractors Association of Delaware Valley, Inc., and Subcontractors Association of Delaware Valley, Inc., Plaintiffs,

v.

CITY OF PHILADELPHIA, Elizabeth Reveal, as Director of Finance for the City of Philadelphia, and Curtis Jones, Jr., as Director of the Minority Business Enterprise Council, Defendants,

and

United Minority Enterprise Associates, Inc., Intervening Defendant.

Civ. A. No. 89–2737.

United States District Court, E.D. Pennsylvania.

April 5, 1990.

CONTRACTORS ASSOCIATION OF EASTERN PENNSYLVANIA, INC., General Building Contractors Association, Inc., Associated Master Painters & Decorators of Philadelphia, Inc., Employing Bricklayers Association of Delaware Valley, Inc., Interior Finish Contractors Association of Eastern

John J. McAleese, Jr., Thomas J. McGoldrick and John H. Widman, King of Prussia, Pa., for plaintiffs.

Carl Vance Johnson Norman, President/CEO, MIS–ATSE Financial Corp., Philadelphia, Pa., amicus-curiae.

Charisse R. Lillie, Philadelphia, Pa., for Redevelopment Authority of the City of Philadelphia.

Seymour Kurland, Charles W. Bowser, Luther E. Weaver, III and James P. Cousounis, Baskin Flaherty Elliott & Mannino, P.C., Philadelphia, Pa., and Charles C. Hileman and Richard S. Mailman, Wyncote, Pa., for defendants.

Robert T. Vance, Jr., Philadelphia, Pa., for United Minority Enterprise Associates, Inc.

Carl E. Singley, Philadelphia, Pa., for Philadelphia Urban Coalition Philadelphia Urban League Minority Enterprise Development Committee.

## MEMORANDUM AND ORDER

BECHTLE, Chief Judge.

Presently before the court are cross-motions for summary judgment on the question of whether the city of Philadelphia's minority, female and handicapped set-aside program is valid in light of the decision of the United States Supreme Court in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

## I. INTRODUCTION

On April 14, 1989, nine incorporated associations of construction contractors that have participated as general contractors or subcontractors on city of Philadelphia construction projects instituted this action against the city of Philadelphia, Elizabeth Reveal, Director of Finance for the city of Philadelphia, and Curtis Jones, Jr., Director of the Minority Business Enterprise Council to have Chapter 17–500 of the Philadelphia Code (hereinafter "the Ordinance") and the Minority Business Enterprise Council (hereinafter "MBEC") regulations declared invalid. The United Minority Enterprise Associates, Inc. intervened in this litigation as a defendant. For the reasons discussed below, the court finds that the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States, and will accordingly grant plaintiff's cross-motion for summary judgment.

In the amended complaint the plaintiffs allege that the Ordinance imposes upon covered city contracts classifications based on race, ethnicity, gender and handicap in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution (Count I); title 42 U.S.C. § 1983 (Count II); title 42 U.S.C. § 1981 (Count III); article I, § 26 of the Pennsylvania Constitution (Count IV); article I, § 28 of the Pennsylvania Constitution (Count V). Plaintiffs claim that these classifications based on race and ethnicity do not withstand the strict scrutiny test announced by the Supreme Court in *City of Richmond v. J.A. Croson Co., supra,* and that the gender- and handicap-based classifications violate the lesser standards of review articulated by the Supreme Court. Plaintiffs also allege that the Ordinance violates title 73 P.S. § 1622 of the Pennsylvania Code, which requires the city to ac-

cept the lowest responsible bid in city contract awards, as the Ordinance requires the rejection of a bid submitted by the lowest responsible bidder on a covered contract exceeding $50,000.00 for the construction, reconstruction, alteration or repair of any public building, public work or other public improvement for noncompliance with the requirements of the Ordinance and the MBEC regulations (Count VI). Finally, Count VII alleges that the Ordinance violates § 8–200 of the Philadelphia Home Rule Charter, insofar as it requires the rejection of a bid submitted by the lowest responsible bidder on a covered contract exceeding $2,000 for noncompliance with the requirements of the Ordinance.

Defendants respond that the plaintiff contractors' associations lack standing to pursue their federal equal protection and civil rights claims (Counts I through III) and that they fail to allege facts sufficient to establish that the Ordinance deprived them of their constitutional rights.

To resolve the issues presented in the parties' cross-motions this opinion will recount the stipulated facts (part I), set forth the standard for summary judgment (part II, section A), address the standing issue (part II, section B), discuss the standard with which affirmative action programs must comply as set forth in *Croson* (part II, section C), and analyze the merits of plaintiffs' claims by examining whether the Philadelphia city council has met its burden under *Croson* (part II, section D).

## II. UNDISPUTED FACTS

The parties submit that the material facts that form the basis for this litigation are not in dispute. The undisputed facts are as follows.

On May 13, 1982, the Philadelphia city council passed over Mayor Green's veto Bill No. 1174–A ("an ordinance amending Title 17 of the Philadelphia Code by adding Chapter 17–400, establishing goals for the participation of Minority and Female Owned Businesses [hereinafter "MBE" and "FBE"] in the awarding of city contracts including but not limited to supplies and services, equipment, materials and public works construction; establishing a Minority Business Enterprise Council; providing procedures and penalties to monitor and enforce compliance"). As stated in the preamble, one of the goals of the Ordinance, is "to encourage participation in the awarding of city contracts for supplies and services, equipment, materials and public works construction regardless of race, color, sex, religion, national origin, or ancestry." The preamble also states that the most important intent and purpose of the Ordinance is "the Economic Development of the minority and female owned business community through a 'sheltered market' process." Among the stated reasons for the Ordinance is "[a] pattern of past and present racial, sexual and economic discrimination" in the awarding of contracts with the city of Philadelphia. Preamble, Bill No. 1174–A.

The Ordinance provided that it "shall be applied to all City Contracts and all City ... Departments, Agencies, Authorities, Commissions and Councils." § 17–402. The Ordinance established the following MBE and FBE participation goals:

(a) Fifteen percent (15%) City Contract participation for [MBEs]; and

(b) Ten percent (10%) City Contract participation for [FBEs].

The above stated percentages relate to the total dollar amount of City Contracts during each of the City of Philadelphia's Fiscal Years.

§ 17–403.

The Ordinance defines "MBE" as:

(a) A sole proprietorship where the sole proprietor is a minority person; or

(b) A business corporation where 51% of the interest in such corporation are beneficially owned by minority person(s) and minorities occupy the majority of management and Board positions and control all decisions concerning the corporation; or

(c) A partnership where 51% of the partnership interest in such partnership are beneficially owned by minority person(s) and minorities occupy the majority of management and partnership positions

and control all decisions concerning the partnership; or

(d) Any other business or professional entity where 51% of the interest are beneficially owned by minority person(s) and minorities occupy the majority of management and Board positions and control all decisions concerning the entity. § 17–401(1).

Under the Ordinance, the term "minority person" includes "Black Americans; Hispanic Americans; Native Americans (American Indians, Eskimos, Aleuts, or Native Hawaiians); Asian Pacific Americans ..." § 17–401(5). The definition of "FBE" is the same as that of "MBE", except that it replaces all references to minority person(s) or minorities with woman or women. § 17–401(2).

The Ordinance also created a Minority Business Enterprise Council (MBEC) to help implement, monitor and enforce its goals. Under the Ordinance, the MBEC is, *inter alia,* required to devise a certification procedure to assure that businesses taking advantage of the Ordinance are legitimate MBEs or FBEs. § 17–404(a). The MBEC was also given the responsibility of ascertaining the total number of MBEs and FBEs in the Philadelphia area. § 17–404(b). In addition, the MBEC was also required to devise policies, regulations and procedures for assuring the participation of MBEs and FBEs in various city contracts. § 17–404(e).

On November 4, 1982, Mayor Green approved Bill No. 1477 (an Ordinance amending Chapter 17–400 by renumbering it to Chapter 17–500 *et seq.,* and by making certain additions and deletions). The amended Ordinance set forth a revised definition of "minority persons":

"A person who is a citizen or lawful permanent resident of the United States and who is:

(a) Black (a person having origins in any of the black racial groups in Africa);

(b) Hispanic (a person of Spanish or Portuguese culture with origins in Mexico, South or Central America, or the Caribbean Islands, regardless of race);

(c) Asian American (a person having origins in any of the original peoples of the Far East, Southeast Asia, the Indian Subcontinent or the Pacific Islands); or

(d) American Indian or Alaskan Native (a person having origins in any of the original peoples of North America.)" § 17–501(1).

The definitions for "MBE" and "FBE" in Bill 1477 were textually similar to those provided in the May 1982 Ordinance except for replacing "minority persons" for "minority person(s)" or "minorities" and "female" for "women" and "woman". § 17–501(3) and (4). In addition, the amendments created a "sheltered market," defined as a city-wide procurement system whereby certain contracts are selected and specifically set aside for MBEs or FBEs, or both, on a competitive bid or negotiated basis. § 17–501(5).

The amended Ordinance also provided that the goals announced in § 17–503(1) are not to be construed as absolute upper limits on the amount of city contracts in which MBEs and FBEs are able to participate, and stated that the goals are applicable to all types of city contracts. In addition, the amended Ordinance added subsection (2) to § 17–503 (formerly § 17–403), which described under what circumstances the total dollar amount of a subcontract, contract up to a million dollars, or contract over a million dollars shall be counted towards MBE or FBE participation for purposes of calculating the fifteen and ten percent figures in § 17–503(1).

The amendments also gave the MBEC the authority to recommend that an entire class of contracts established pursuant to § 17–503 be exempt from MBE and FBE city contracting goals when there has been a written determination based on the best information available that there is an insufficient number of qualified MBEs or FBEs in the Philadelphia area to ensure adequate competition and an expectation of reasonable prices on bids or proposals within that class. § 17–505(2)(a). The MBEC also has authority under § 17–505(3) to grant a waiver to a contractor who was unable to comply with the established goals for MBE

or FBE participation but has demonstrated that there has been a good faith effort to comply. Section 14–504(e) authorizes the MBEC by regulation to define the specifics of the sheltered market program.[1]

On May 20, 1987, the Mayor approved Bill No. 1260, an ordinance amending Chapter 17–500. The 1987 Ordinance was refocused to provide for increased participation in city contracting of "Disadvantaged Business Enterprises" [hereinafter "DBEs"] rather than for MBEs or FBEs. However, the 1987 Ordinance maintained the same percentage participation goals for MBEs and the FBEs as specified in the 1982 Ordinance. § 17–503(1).[2]

The 1987 Ordinance amended the definition of "minority person" to substitute "Native American" for "American Indian or Alaskan Native". It also added the following definitions:

(a) Small business shall mean a business which is independently owned and operated and which is not dominant in its field of operation as further defined in 13 Code of Federal Regulations, Part 121.3, incorporated herein, and made a part by reference ...

(b) Disadvantaged business enterprise or "DBE" shall mean any small business;

(a) Which is at least fifty-one percent (51%) owned by one or more socially and economically disadvantaged individuals or

(b) In the case of any publicly owned business, one in which at least fifty-one percent (51%) of the stock is owned by one or more socially and economically disadvantaged individuals.

Where a business has received more than Five Million Dollars ($5,000,000) of contract work with the City under this Chapter, the [MBEC] shall make a rebuttable presumption that the concern is not a disadvantaged business enterprise, and any previous certification as a [DBE] shall be re-evaluated pursuant to regulations to be promulgated by the MBEC.

(11) Socially and economically disadvantaged individuals shall mean those individuals who have been subjected to racial, sexual or ethnic prejudice because of their identity as a member of a group without regard to their individual qualities, and whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business who are not socially disadvantaged.

(a) In determining who are socially and economically disadvantaged individuals, the [MBEC] may make a rebuttable presumption that all minority persons and all women shall be so classified.

(b) The [MBEC] in making said determination, shall also consider, among other things, the extent of the liquid assets and net worth of such socially disadvantaged individuals.

Finally, on October 26, 1988, the Mayor approved Bill No. 108, an Ordinance amending Chapter 17–500 of the Philadelphia Code by establishing city contract participation goals for handicapped persons. The 1988 amendments revised the definition of "socially and economically disadvantaged individuals" in § 17–501(11) to read:

Socially and economically disadvantaged individuals shall mean those individuals who have either been subjected to racial, sexual or ethnic prejudice because of their identity as a member of a group or differential treatment because of their handicap ...

---

1. Part 11 of the Regulations establishes this sheltered market program. The sheltered market is separate and apart from the set-asides established in the Ordinance. Part 11 authorizes the setting aside of certain prime contracts for participation only by M–DBEs, F–DBEs and H–DBEs. Neither Chapter 17–500 nor the Regulations limit the amount and number of contracts that may be reserved by the city for this sheltered market.

2. Because the city council maintained separate participation goals for MBEs and FBEs, these labels remain relevant. Accordingly, the court will generally refer to the preferred classes by these designations. However, the designations "minority-disadvantaged business enterprise" [M–DBE] and "female-disadvantaged business enterprise" [F–DBE] will sometimes be used.

§ 17–501(11). The Ordinance added a definition of "handicapped person", to wit:

... a person who has a physical or mental impairment which substantially limits one or more of his or her major life activities or has a record of such an impairment. Major life activities shall mean functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.

§ 17–501(12). The Ordinance also added a definition of "Handicapped–Owned Business" [hereinafter "HBE"] equivalent to that for MBEs and FBEs, except that it replaced references to "minority persons" or "female" with "handicapped persons(s)".

§ 17–501(13). Lastly, the Ordinance amended the section to read, in pertinent part:

The goals shall be:

(c) Two percent (2%) City contract participation for Handicapped Owned Businesses.

§ 17–503(1).

### III. DISCUSSION

#### A. Summary Judgment Standard

The function of a motion for summary judgment is to avoid a trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). In evaluating a motion for summary judgment, the court may examine the pleadings and other materials offered by the parties for the purpose of determining if there is a genuine issue of material fact to be tried. Fed.R.Civ.P. 56(c). *Sims v. Mack Truck Corp.*, 488 F.Supp. 592, 597 (E.D.Pa.1980). The United States Supreme Court has directed that summary judgment "shall be rendered forthwith" if it appears from an application of substantive law to the uncontroverted facts that the movant is entitled to judgment as a matter of law. *Id. See also Celotex Corp v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987) (*en banc*); *Arnold Pontiac–GMC, Inc. v. General Motors Corp.*, 786 F.2d 564, 568 (3d Cir.1986). "As to materiality, the substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" only if the evidence is such that a reasonable jury could find for the non-moving party. *Id.*

The burden to demonstrate absence of material fact issues remains with the moving party regardless of which party would have the burden of persuasion at trial. If, however, the non-movant will bear the burden of persuasion at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. at 327, 106 S.Ct. at 2554.

A party resisting a Fed.R.Civ.P. 56 motion cannot expect to rely upon bare assertions, conclusory allegations, or a mere cataloguing of affirmative defenses to defeat summary judgment. *Celotex, supra,* 477 U.S. at 323–24, 106 S.Ct. at 2552–53; *Gans v. Mundy,* 762 F.2d 338 (3d Cir.1985). Once the moving party has presented evidence which would require a directed verdict a trial, the burden shifts to the opposing party to respond with specific facts showing that a genuine issue for trial exists. If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against them. Fed.R. Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10.

#### B. Plaintiffs' Standing

Defendants claim that the plaintiff contractors' associations do not have standing to challenge the constitutionality of the Or-

dinance. The plaintiffs allege no injury to the associations themselves, but rather claim that individual members of the associations have been harmed by the Ordinance. Thus, the court must inquire whether the nine contractors' associations may proceed solely as representatives of those of its members that have been injured by the Ordinance.

The United States Supreme Court has addressed the issue of when an association may have standing on behalf of its members. It is well-settled that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, et al. v. Brock,* 477 U.S. 274, 281, 106 S.Ct. 2523, 2528, 91 L.Ed.2d 228 (1986); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975).

■ The Court has ruled that such representational standing, while it "does not eliminate or attenuate the constitutional requirement of a case or controversy" *id.,* is permissible under Article III under certain circumstances. *International Union,* 477 U.S. at 281, 106 S.Ct. at 2528. In *Warth,* the Supreme Court described the circumstances in which an association may litigate in federal court on behalf of its members:

> The association must allege that its members, or any one of them are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party dispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction. *Warth,* 422 U.S. at 511, 95 S.Ct. at 2211.

The Supreme Court later expressed this doctrine in a three-part test:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

To determine whether the plaintiff associations in this case have met the requirements enunciated in *Hunt,* this court will examine each of the three components. Preliminarily, the court notes that in ruling on a motion for summary judgment for want of standing, the court must accept as true all material allegations of the amended complaint, and must construe them in favor of the complaining party. *Warth,* 422 U.S. at 502, 95 S.Ct. at 2207.

1. *Standing of Members under Article III of the United States Constitution*

■ The associations must show that their members would otherwise have standing to sue in their own right by demonstrating that they meet the requirements of Article III of the United States Constitution (hereinafter "Article III"). To do so, the members must assert a personal stake in the outcome of the controversy demonstrating that they have sustained an injury in fact, *see Warth,* 422 U.S. at 498–99, 95 S.Ct. at 2204–05, and show that their injury was caused by the putatively illegal action of the defendant, *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) such that the injury "fairly can be traced to the challenged action of the defendant." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

The injury in fact requirement is designed to ensure that the dispute will be put in the hands of those who have a direct stake in the outcome. *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972). It provides the court with "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends

for the illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). In this context, the *Warth* court specified that where the plaintiff is an association, it "must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action." *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211.

The plaintiffs have shown that they represent associations of construction contractors, all of whom have members who have participated either as general contractors or subcontractors on city of Philadelphia construction projects. They have also shown that the Ordinance requires those bidders on covered contracts that are not MBEs, FBEs or HBEs to commit to subcontract at least 15% of their contract amount to MBEs, at least 10% to FBEs and at least 2% to HBEs. In addition they have shown that there is a certain number of contracts set aside for bidding only by MBEs and FBEs ("sheltered market"). They have also alleged that the Procurement Department and the MBEC must reject any bid on a covered contract that fails to commit to the percentage participation requirements, regardless of whether that bid is submitted by the lowest responsible bidder. Plaintiffs claim that as a result of the Ordinance their members have been excluded from bidding on sheltered market contracts; have been required to subcontract work or enter into joint ventures with MBEs and FBEs at greater expense than they would have incurred had they performed the work with their own forces or subcontracted the work to the lowest responsible bidding subcontractor; and have

been disqualified from participating on covered contracts despite having submitted the lowest responsible bid.

Defendants argue that despite these allegations plaintiff associations have failed to satisfy the injury in fact requirement because they have not shown the existence of any injury to its members of sufficient immediacy and ripeness to warrant judicial intervention. Specifically, defendants point to the associations' failure to allege any of the following: a specific member's loss of an opportunity to bid on a specific city contract; a specific member's loss of an award of a specific city contract on which that member bid; the precise extra expenses incurred by a specific member in the performance of a specific city contract; or specific city contracts on which identified members incurred greater expense by subcontracting the work to comply with the DBE participation requirements rather than by performing the work themselves.

■ Although the court could infer from the information provided in the complaint that the members have been injured by the operation of the Ordinance, the court agrees with defendants that to meet the injury in fact requirement the associations must show the injury suffered by their members with some specificity. To this end, members of six of the nine contractors associations have submitted affidavits detailing the nature of their injury under the Ordinance. The affidavits submitted by members of four of these associations provide information on the injury suffered with sufficient particularity to persuade the court that they meet the Article III requirement of injury in fact.[3] These

**3.** (1) Stephen Colanero, a member of CAEP, stated that he was the lowest responsible bidder on project no. S9–CP3490, but that since he was unable to obtain quotes from qualified MBEs and FBEs to satisfy the participation requirement, and because the MBEC denied his request for a waiver, his bid was disqualified. (2) Charles E. Furtaw, a member of EBA, stated in his affidavit that he was advised by many prime contractors that he could not be used as a subcontractor because of the participation requirements of the Ordinance. In addition, he stated he was forced to refrain from bidding on city projects because the set-asides made the cost of estimating the work prohibitive. (3) James J.

Clearkin, Jr., a member of GBCA, stated that since 1984 he has generally refrained from bidding on city contracts because, despite good faith efforts, he was unable to comply with the MBE and FBE participation requirements. However, he did prepare a bid on project 2085, but was unable to submit it because he could not satisfy the MBE participation requirement. (4) Mark L. Strong, a member of SADV, stated by affidavit that he would have received a subcontract on a project involving Terminal A of the Philadelphia International Airport, for which he was the lowest bidder, if it were not for the MBE and FBE requirements. In addi-

statements indicate to the court that members of these four plaintiff associations have been injured, and the court finds that their injuries provide the court with the best possible facts to "illumin[ate] ... [the] difficult constitutional questions" before it. *Baker v. Carr,* 369 U.S. at 204, 82 S.Ct. at 703.

■ Of the five other associations, members of the NECA and RSMCA also submitted affidavits. These affidavits essentially stated that the members of the associations were notified of the litigation and did not object to it. The members also provided requests for bids on city projects and stated that they generally bid on these types of projects. These affidavits do not provide sufficient details of the injury suffered to meet the Article III requirement. The court acknowledges that members of NECA and RSMCA may have suffered injuries similar to those documented in the affidavits submitted by members of CAEP, GBCA, EBA and SADV, *see supra* n. 4, however such a supposition is too speculative to meet the injury in fact requirement. The court simply cannot infer that plaintiffs have met this requirement; nor will it fill gaps to enable plaintiff to do so. Thus, the court finds that, on the record before it, NECA and RSMCA do not have standing to challenge the constitutionality of Chapter 17–500.

■ Finally, because members of MCAEP, IFCA and AMPD did not submit affidavits detailing their injury and since the allegations in the complaint fail to specify the injury with sufficient particularity, these three associations do not have standing to litigate the constitutionality of the Ordinance. Thus, the court will proceed in the analysis of the issues presented by this litigation with CAEP, GBCA, EBA and SADV as named-plaintiffs. Hereinafter, the term "plaintiffs" or "plaintiff associations" will refer only to these four contractor associations.

The court notes that the declaratory relief provided by the court will apply to five associations that are no longer named plaintiffs in this action. In addition, this determination that NECA, RSMCA, AMPD, IFCA and MCAEP do not have standing on this record does not prevent these associations from demonstrating at a later date the necessary injury in fact to attain standing.

■ The court also finds that the plaintiffs have met the causation requirement of Article III. Again, members of plaintiff associations have shown that despite having submitted the lowest responsible bid, the bids were rejected as a result of the members' inability to meet the requirements of the Ordinance. Other cases in this district have found that an allegation such as this meets the causation prong of the Article III test. *See Main Line Paving Co. v. Bd. of Educ., School Dist. of Philadelphia,* 725 F.Supp. 1349, 1353 (E.D. Pa.1989).

Taken together, the allegations in the amended complaint and the affidavits show that plaintiffs' members have standing in their own right. As did another district court in this circuit when examining similar facts, the court finds that the alleged effect this Ordinance has had on contractors doing business on city of Philadelphia projects are "real and sufficient to assure a concrete controversy and aggressive presentation of the constitutional question." *See Contractors Association of Western Pennsylvania v. Kreps,* 441 F.Supp. 936, 946 (W.D.Pa.1977). The Third Circuit has acknowledged that such contractors are "those most likely to have suffered injury" by the operation of a set-aside Ordinance like the one at issue here. *Rocks v. City of Philadelphia,* 868 F.2d 644, 648 (3d Cir. 1989). Finally, the court does not find that the first prong of the *Hunt* test requires that *each and every* member of a plaintiff association show injury in fact. Supreme Court cases construing *Hunt* have made it

tion, Mr. Strong stated that he would have bid on a project involving the installation of closed circuit television networks but for the fact that the project was reserved or sheltered market

bidders. Finally, Mr. Strong stated that his costs were $42,000 on another bid, project no. 4325R, as a result of the set-aside requirement.

clear that it is sufficient if some of the members have shown that they have been injured by the putatively illegal conduct. In *International Union, et al. v. Brock*, 477 U.S. 274, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) the Supreme Court ruled that the plaintiff Union had standing because "at least some members of the UAW would have had standing to bring this suit in their own right." *Id.* at 288, 106 S.Ct. at 2532.

### 2. *Germaneness*

The second *Hunt* requirement does not appear to be at issue, and there is little question that the interests plaintiff associations seek to protect in this lawsuit are "germane to the organization[s'] purpose." *Hunt*, 432 U.S. at 343, 97 S.Ct. at 2441. The following goals constitute the stated purpose of the plaintiff associations:

> ... establishing and maintaining high standards of performance in the construction business and establishing its members in the public mind as contractors who fulfill obligations in good faith and with consummate skills; promoting relations between its members and purchasers of their services including the City of Philadelphia; representing the interests of its members respecting issues of significance to them as contractors; and eliminating waste and reducing the cost of construction.

Amended Complaint at 5. The interests sought to be protected by this lawsuit are the prevention of unlawful discrimination in the letting of city of Philadelphia contracts. Members of the associations have alleged that this discrimination has caused an increase in the cost of compliance with bidding specifications and has raised the cost of construction to the city. These purposes seem to this court to be squarely in line with the Associations' stated goals. A lawsuit challenging a set-aside requirement of the Public Works Employment Act was found to be germane to the purpose of a contractors association in *R.I. Chapter, Assoc. General Contractors v. Kreps*, 450 F.Supp. 338, 347 n. 10 (D.R.I.1978).

### 3. *No need for individual participation*

The defendants contend that the plaintiff associations cannot meet the third *Hunt* requirement because they have MBE, FBE and/or HBE members that presumably benefit from the Ordinance. Defendants argue that because some members of plaintiff associations would be harmed if the set-aside program is dismantled, the very goal of this litigation, there is an inherent conflict of interest that defeats standing.

The last of the *Hunt* requirements is designed to insure that the association itself can invoke the court's remedial powers, and that participation of individual association members is not necessary. The Supreme Court has denied standing for failure to meet this requirement in cases where the damages sought are not common to the entire membership, the damages are not shared by all in an equal degree, or where the fact and extent of differing injury would require individualized proof. *Warth*, 422 U.S. at 515, 95 S.Ct. at 2213.

The plaintiff associations before this court do not suffer from the same defects present in *Warth*. Plaintiffs seek a judgment declaring invalid Philadelphia's minority, female and handicapped business set-aside program. The matter of the Ordinance's constitutionality in light of *Croson* is a pure question of law, and thus similar to the matter before the Supreme Court in *Brock*. There the court considered whether the United Auto Workers had standing to bring suit against the Department of Labor challenging the Department's policy of not permitting weeks in which employees draw nonregular wages to be considered a week of employment for purpose of determining eligibility for trade readjustment allowance benefits. The Court in *Brock* ruled that the UAW had satisfied the third *Hunt* requirement, finding that "[n]either th[e] claims nor the relief sought required the District Court to consider the individual circumstances of any aggrieved UAW member.... The suit raises a pure question of law: whether the Secretary properly interpreted the Trade Act's TRA eligibility provisions." *Brock*, 477 U.S. at 287, 106 S.Ct. at 2531.

The question of whether the Ordinance violates the Equal Protection Clause

of the Fourteenth Amendment can be adjudicated without reference to the particular circumstances of members of the plaintiff associations. Typically, an association will be denied standing where the evidence required to prove liability or define the appropriate remedy is peculiar to each member injured by the challenged conduct. *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213. Generally, this arises where monetary damages are claimed that may differ from member to member. However, where proof peculiar to a particular member is not required on the liability or remedy issues, an association properly may maintain the action on behalf of one or more of its injured members. *Id.* Plaintiff associations have sought declaratory relief not damages, and thus there is no need for participation by individual members. *See R.I. Chapter,* 450 F.Supp. at 347, n. 3. The fact that some of the members may have suffered more actual damages than other members is not a bar to standing because the court can decide the constitutionality of the Ordinance without regard to proof of damages. Furthermore, the outcome of this suit by the associations has the same effect on any MBE, FBE or HBE member as would any facial attack brought by a single contractor on his or her own behalf.

■ Finally, the membership in plaintiffs associations of MBEs, FBEs or HBEs that may not be harmed by the Ordinance does not defeat the standing of the associations. As stated above, the issue before the court does not mandate an inquiry into damages sustained by individual members. In addition, the courts that have addressed this question of whether a potential conflict of interest among members of a plaintiff association over the subject of the litigation will defeat that association's organizational standing have indicated it does not, unless a majority openly opposes the association's position. In *NCAA v. Califano,* 622 F.2d 1382, 1391 (10th Cir.1980), the Tenth Circuit stated that if more members openly oppose the association's position in the litigation than openly favor it, then associational standing is lost. However, in that case many members of the plaintiff association (the NCAA) were also members of a women's intercollegiate sports association that was on the other side of the litigation. The conflict alleged in the case before this court does not approach that existing in *NCAA.*

Moreover, information provided to the court concerning the four plaintiff associations indicates that of a total of 535 members, only 29 are registered MBEs, FBEs or HBEs. Such a small percentage of potentially-unharmed members was found not to destroy the standing of a contractors association to challenge the constitutionality of a set-aside ordinance in *R.I. Chapter,* 450 F.Supp. at 347, n. 3. In addition, both parties acknowledge that each of the plaintiff associations has obtained authorization to commence this action. Finally, the case cited by the defendants for the proposition that a conflict of interest among the members of an association prevents that association from having standing, *AGC v. Otter Tail Power,* 611 F.2d 684 (8th Cir.1979), does not support defendants' argument. In that case, the Eighth Circuit did find an "obvious" conflict of interest among the members' status and interest, however, the court denied organizational standing because it also found that the interests were so diverse that individual representation was required. Many of the cases denying organizational standing where there is a substantiated claim of a conflict of interest among members do so where proof of individual claims would be required to obtain the sought after relief. *See Harris v. McRae,* 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1979). As discussed above, no such individual representation is required in this case.

Although it is true that there are DBE members of plaintiff associations that may arguably be benefitted by the Ordinance, the court finds that the conflict created by their presence is too allusive to defeat standing. First, the court will not presume that the DBE members of plaintiff associations will be harmed by the possible invalidation of the Ordinance. There was testimony before the city council expressing concern over the growth of fraudulent M-DBEs and F-DBEs. *See* Transcript of

Hearing before the Council of the City of Philadelphia, April 29, 1987, at 581 [hereinafter "Transcript"]. These businesses use a minority or woman owner as a front to enable non-minority and non-female DBEs to bid for covered contracts. If such fraudulent businesses are truly a problem as the city suggests, then the court will not assume that every DBE stands to be harmed by the dismemberment of the set-aside program.

For all of the reasons stated above, this court finds that plaintiffs CAEP, GBCA, EBA and SADV have demonstrated that they meet the three requirements for organizational standing set out by the Supreme Court in *Hunt,* and they accordingly have standing to litigate this law suit on behalf of their members.

## C.  Croson Standard

In the past decade, the United States Supreme Court has struggled with the question of the appropriateness and validity of government-sponsored affirmative action programs in three cases: *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) and *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). However, in each of these cases the Court did not reach a majority consensus about the standard of review applicable to racial classifications, the purpose and evidence necessary to support such classifications, or the permissible scope of affirmative action plans. *Milwaukee County Pavers Ass'n v. Fiedler,* 707 F.Supp. 1016, 1021–22, *modified,* 710 F.Supp. 1532 (W.D.Wisc.1989). While the Philadelphia Ordinance presently before this court was in effect, the Supreme Court decided *Croson, supra.* Although the *Croson* decision resolves only some of these issues, it forms the basis for the analysis of plaintiffs' claims against the Philadelphia Ordinance. As will become evident, the parallels between the *Croson* case and this case are notable. The court will conduct a brief review of the Supreme Court's earlier affirmative action decisions to show the state of the law prior to *Croson.* The court will then discuss the *Croson* decision in greater detail, as the Philadelphia Ordinance will be held to the standard articulated in that case.

### 1. *Pre–Croson Decisions*

The District of Columbia Circuit cogently summarized the pre-*Croson* cases in *Shurberg Broadcasting of Hartford, Inc. v. F.C.C.,* 876 F.2d 902, 910–12 (D.C.Cir.1989), and the following is extracted therefrom.

*Bakke* struck down a university admissions policy that set aside a fixed percentage of each class for minority candidates. Justice Powell's was the only opinion in the majority reaching the constitutional issue. He rejected the justification that a racial classification could be based on a mere desire to assure that the student body contain specific percentages of particular racial and ethnic groups. 438 U.S. at 307, 98 S.Ct. at 2757. He also rejected the use of a preference as a remedy for past discrimination, because the university had not made any such findings, and was not competent to do so. *Id.* at 307–09, 98 S.Ct. at 2757–58. However, Justice Powell did acknowledge that an academic institution has a compelling interest in promoting a diverse educational environment. *Id.* at 311–14, 98 S.Ct. at 2759–60. He stated that racial diversity is only one part of the "genuine diversity" that is a compelling state interest. *Id.* at 315, 98 S.Ct. at 2761. Thus, the university could have used race as one factor in a multi-factor admissions decision. Simply employing a racial set-aside was inconsistent with the goal of "genuine diversity," which requires consideration of factors other than race. *See id.* at 315–18, 98 S.Ct. at 2761–62.

In *Fullilove* the Court considered a facial challenge to the constitutionality of a set-aside provision in an Act of Congress authorizing funding for public works construction. In his plurality opinion, Chief Justice Burger stressed Congress' unique constitutional authority under the Fourteenth Amendment to enact measures designed to remedy past discrimination. *See* 448 U.S. at 472–78, 100 S.Ct. at 2771–74.

Justice Powell's concurrence stressed that Congress had made the finding of past discrimination in the public procurement process and had selected the particular remedy. *See id.* at 503–06, 100 S.Ct. at 2787–89. The Court discussed features of the legislative history and the implemented program, determined that the set-aside was narrowly tailored to its remedial purpose, and upheld the program. Significantly, the Court found that the program was designed by Congress to assure that preference would be awarded only to disadvantaged minority enterprises who continue to suffer effects of past discrimination. The court also emphasized that the set-aside was likely to impose only a slight burden on nonminorities since it touched merely a small proportion of the total funds expended in the construction industry and because the effects were not concentrated on particular individuals. *See id.* at 484, n. 72, 100 S.Ct. at 2778, n. 72. (Powell, J., concurring).

Finally, in *Wygant,* the Court held unconstitutional a school layoff policy that accorded minority teachers a preference over nonminorities with seniority. The Court found that the school board had failed to establish evidence of past discrimination to justify remedial action. *See* 476 U.S. at 277–78, 106 S.Ct. at 1848–49. However, the Court relaxed its previous requirement that the governmental body make "findings" of discrimination, and instead authorized preferences to be predicated on "substantial evidence of discrimination." *Id.* at 289–92, 106 S.Ct. at 1854–56. The Court did reject flatly as a justification for the preferences the school's asserted need to provide minority role models because it had "no logical stopping point." *Id.* at 275–76, 106 S.Ct. at 1847–48. The Court held that the layoff provision was not narrowly tailored to achieve its remedial purpose because the hiring goal was calculated as a ratio of black teachers to black students, rather than as a ratio of black teachers to qualified minority teach-

ers within the relevant labor pool. *Id.* at 294, 106 S.Ct. at 1857.

### 2. *Croson Decision*

In *Croson,* the Supreme Court addressed the applicability of its prior decision in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) to a minority set-aside program adopted by the city of Richmond.[4]

Part I of the *Croson* decision outlined the background of the Richmond set-aside program. In 1983 the Richmond city council adopted the Minority Business Utilization Plan [hereinafter "the Plan"], that required prime contractors on city construction contracts to subcontract at least 30% of the dollar amount of the contract to one or more MBEs. This set-aside did not apply to minority-owned prime contractors. The Plan was structurally similar to the Ordinance under attack in this litigation. It defined an MBE as "[a] business at least fifty-one (51) percent of which is owned and controlled ... by minority group members." *Croson,* 109 S.Ct. at 713. Minority group members were defined as "citizens of the United States who are Blacks, Spanish-speaking, Orientals, Indians, Eskimos, or Aleuts." *Id.* Richmond's set-aside was open to qualified MBEs from anywhere in the United States. The Plan claimed it was remedial in nature and enacted "for the purpose of promoting wider participation by minority business enterprises in the construction of public projects." *Id.*

Richmond's plan contained a waiver provision. The Director of the Department of General Services was directed to promulgate rules allowing waivers where a contractor can prove that despite every feasible attempt to comply with the Plan, the requirements could not be achieved.

The Richmond city council enacted the Plan after a public hearing at which five members of the public testified against the ordinance and two in favor. Supporters of the Plan relied on a study indicating that, while the general population of Richmond was 50% black, only .67% of the city's

---

**4.** The *Croson* decision is written in several parts, each joined by different justices. Justice O'Connor's opinion constitutes the plurality opinion of the Court, and will be the basis of this court's analysis.

prime construction contracts had been awarded to MBEs from 1978 to 1983. The proponents of the set-aside provision also relied on evidence that many Richmond contractors' associations had virtually no MBEs as members, and testimony that there was widespread exclusion on the basis of race in the Richmond area, in the state, and around the nation. *Id.* at 714. The Richmond city council heard no direct evidence that the city had discriminated on the basis of race in letting contracts or that the city's prime contractors had discriminated against minority-owned subcontractors.

Part II examined the scope of the city's power to adopt legislation designed to remedy past discrimination. The Court rejected both Croson's argument that the Court's holding in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) required Richmond to limit any race-based remedial efforts to eliminating the effects of its own discrimination, and Richmond's argument that the decision in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) controls and gives Richmond the power to define and attack the effects of prior discrimination in its local industry.

Justice O'Connor distinguished the *Fullilove* decision from the facts surrounding the Richmond Plan. Justice O'Connor rejected Richmond's argument that its remedial powers were as broad as those of Congress, stating that appellant ignored the fact that Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. That power to "enforce" may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations. *Croson,* 109 S.Ct. at 719.

In a section of Part II that is particularly relevant to the case before this court, Justice O'Connor further contrasted the broad remedial powers granted to Congress in this area from the rather narrow ones granted to the States and local governments:

That Congress may identify and redress the effects of society-wide discrimination does not mean that, *a fortiori,* the States and their political subdivision are free to decide that such remedies are appropriate. Section 1 of the Fourteenth Amendment is an explicit *constraint* on state power, and the States must undertake any remedial efforts in accordance with that provision. To hold otherwise would be to cede control over the content of the Equal Protection Clause to the 50 state legislatures and their myriad political subdivision. The mere recitation of a benign or compensatory purpose of the use of a racial classification would essentially entitle the States to exercise the full power of Congress under § 5 of the Fourteenth Amendment and insulate any racial classification from judicial scrutiny under § 1. We believe that such a result would be contrary to the intentions of the Framers of the Fourteenth Amendment, who desired to place clear limits on the States' use of race as a criterion for legislative action, and to have the federal courts enforce those limitations.

*Id.*

However, Justice O'Connor also relied on the Court's decision in *Wygant* for the proposition that "a state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimination within the constraints of § 1 of the Fourteenth Amendment. *Id.* 109 S.Ct. at 720. Thus, under *Wygant,* if Richmond could show that it had essentially become a "passive participant" in a system of racial exclusion practiced by elements of the local construction industry, it could take affirmative steps to dismantle such a system. The Court stated that, as long as a public entity could identify the discrimination with the particularity required by the Fourteenth Amendment, it has a compelling interest in assuring that public dollars do not serve to finance the evil of private prejudice. *Id.*

In Part IIIA the Court observed that the Fourteenth Amendment provides that "[N]o State ... shall deny to any person within its jurisdiction the equal protection

of the laws," and found that the Richmond Plan denied certain citizens the opportunity to compete for a fixed percentage of public contracts based solely upon their race.

According to Justice O'Connor, regardless of the racial group to which the effected persons belonged, any classification based on race must be subject to the test of strict scrutiny. The purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is proposing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype. *Id.* at 721.

*Croson* reaffirmed the view expressed by the plurality of the Court in *Wygant* that the application of the strict scrutiny test is not dependant on the race of those burdened or benefitted by the classification. Justice O'Connor further justified the use of heightened scrutiny because of the concern that a political majority may act to the disadvantage of a minority, pointing out that 50% of the population of Richmond is black and five of nine city council seats are held by blacks.

Justice O'Connor compared the Court's decision in *University of California Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), where the Court applied heightened scrutiny to a University of California racial quota that reserved 16 out of 100 seats in its entering class for certain minority groups. In *Bakke,* Justice Powell's plurality opinion rejected as the quota's justifications both a desire to have more black medical students and doctors and an effort to counter the effects of societal discrimination. *Id.* at 307, 98 S.Ct. at 2757. Justice Powell indicated that a government only has a compelling interest in favoring one race over another when there have been judicial, legislative or administrative findings of constitutional or statutory violations. *Croson* reaffirmed the position taken by a plurality of the Court in *Bakke* and *Wygant* that the government's goal of remedying discrimination by imposing a racial classification must be focused on wrongs worked by specific instances of racial discrimination, *id.* at 308–09, 98 S.Ct. at 2757–58, rather than a more amorphous societal discrimination.

Part IIIA of the opinion discussed the inadequate justification for the race-based system of employee lay-offs ultimately invalidated by the Court in *Wygant.* The justification focused on the perceived need for role models to alleviate the effects of prior societal discrimination. The *Wygant* Court rejected the role model theory for two reasons: first, the statistical disparity between students and teachers was not probative of employment discrimination; and secondly, the theory had no relation to a satisfactory basis for believing discrimination had occurred and thus potentially could justify race-based decisionmaking "essentially limitless in scope." *Croson,* 109 S.Ct. at 723, *citing, Wygant,* 476 U.S. at 276, 106 S.Ct. at 1848.

In Part IIIB the Court applied the strict scrutiny standard to the Richmond Plan and found that evidence offered in support of it suffered from the same defects identified as fatal in *Wygant.* The city had argued that it was attempting to remedy various forms of past discrimination that were alleged to be responsible for the small number of minority businesses in the local contracting industry. *Croson,* 109 S.Ct. at 723. Justice O'Connor found that none of the findings relied upon by the district court, which upheld the Plan, established "a prima facie case of a constitutional or statutory violation by anyone in the Richmond construction industry." *Croson,* 109 S.Ct. at 724.

The Court ruled that the following facts relied upon by the district court were an inadequate basis for the 30% quota and rejected them for the stated reasons: (1) The ordinance declares itself to be remedial. The Court said that the mere recitation of a "benign" or legitimate purpose for a racial classification is entitled to little or no weight. *Id.* at 724. (2) Several proponents of the measure stated their views that there had been past discrimination in the

construction industry in this area, the State and around the nation. The Court found these statements to be "of little probative value in establishing identified discrimination in the Richmond construction industry. *Id.* (3) Minority businesses received .67% of prime contracts from the city while minorities constituted 50% of the city's population. The plurality found that reliance on this disparity was misplaced because where special qualifications are required to fill particular jobs, comparisons to the general population have little probative value. *Id.* at 725. (4) There were very few minority contractors in local and state contractors' associations. The Court stated that, standing alone, this fact is not probative of any discrimination in the local construction industry. *Id.* (5) In 1977, Congress made a determination that the effects of past discrimination had stifled minority participation in the construction industry nationally. *Id.* The plurality stated that this finding from *Fullilove* was of extremely limited probative value, reiterating the analysis from Part IIIA. The Court concluded that none of these findings, singly or together, provided Richmond with a "strong basis in evidence for its conclusion that remedial action was necessary." *Id.*, *citing, Wygant*, 476 U.S. at 277, 106 S.Ct. at 1848.

Although Justice O'Connor stated that the States and their subdivisions may take remedial action when they possess evidence that their own spending practices are exacerbating a pattern of prior discrimination, she warned that "they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief." *Croson*, 109 S.Ct. at 727. Because the evidence offered by Richmond did not point to any identified discrimination in the local construction industry, the Court held that the city failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race.

Justice O'Connor stated that the above analysis applies only to the inclusion of blacks within the Richmond set-aside program. The Court easily struck down the set-aside with regard to Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons because the city presented no evidence of past discrimination against such persons.

In Part IV, Justice O'Connor stated that it was almost impossible to assess whether the Richmond Plan was narrowly tailored to remedy prior discrimination. First, the Court observed that it did not appear that Richmond gave any consideration to the use of race-neutral means to increase minority business participation in city contracting. The Court noted that many of the barriers to minority participation in the construction industry relied upon by the city appeared to be race neutral, and thus the city could have, for example, attempted a race-neutral program of city financing for small firms to help them meet bonding requirements.

Second, *Croson* found that the 30% quota did not seem to be narrowly tailored to any goal, except perhaps "outright racial balancing," and that the Plan appeared to rest on the unrealistic assumption that minorities will choose a particular trade "in lockstep proportion to their representation in the local population." *Id.* at 728. The Court stated, as further evidence that the program was not narrowly tailored, that under the Richmond Plan a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race. *Id.* at 729.

Part V of the opinion discussed the circumstances in which States and local governments may act to rectify the effects of identified discrimination within their jurisdiction. This advise was cogently capsulized in *The Cone Corporation v. Hillsborough County*, 723 F.Supp. 669 (M.D.Fla. 1989):

(1) [W]here there is evidence of systematic exclusion of MBEs, the entity may take action to end the discriminatory exclusion. (2) [W]here there is significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors engaged by the locality or prime contrac-

tors, an inference of discriminatory exclusion could arise, and the entity could act to dismantle the closed business system by taking appropriate action against those who discriminate (in an "extreme" case, a narrowly tailored racial preference "might be necessary"). (3) [W]here there are individual instances of racially motivated refusal to employ minorities, an entity would be justified in penalizing the discriminator and providing "appropriate relief" to the victim. (4) [If] supported by appropriate statistical proof, evidence of a pattern of individual discriminatory acts may lend support to a determination that broader remedial relief is justified ... (5) [I]n the absence of evidence of discrimination, the entity may employ an "array of race-neutral devices" to increase accessibility to contracting by small entrepreneurs of all races including: simplification of bidding procedures; relaxation of bonding requirements; training and financial aid for disadvantaged entrepreneurs; and prohibition of discrimination in provision of credit or bonding by local suppliers and banks.

*Id.* at 683–84.

## D. Merits of Plaintiffs' Claims

Plaintiff associations claim that the Philadelphia Ordinance is "essentially identical" to the Richmond Plan at issue in *Croson* and, like the Richmond Plan, fails to satisfy the strict scrutiny standard of equal protection review. This court agrees that the Ordinance must comply with the standard articulated in *Croson*. There is some suggestion in defendants' brief that the Ordinance should not be subject to the *Croson* analysis because the Ordinance classifies the preferred party based on socially or economically disadvantaged status, rather than racial or ethnic characteristics. In support of this position, defendant relies on a Western District of Wisconsin case in

which the court provisionally held on a motion for a preliminary injunction that plaintiffs had a reasonable likelihood of success on their federal equal protection claim challenging a Wisconsin "Disadvantaged Business Demonstration and Training Program." *See Milwaukee Co. Pavers,* 707 F.Supp. 1016, *modified,* 710 F.Supp. 1532 (W.D.Wisc.1989). In pertinent part, the Wisconsin statute provided that the state reserve four million in construction contracts for socially and economically disadvantaged businesses.[5] Under the language of the statute and the relevant provisions of the Code of Federal Regulations, a woman or minority group member is presumed socially and economically disadvantaged.

In *Milwaukee Co. Pavers,* Judge Crabb rejected defendants' argument that the Milwaukee statute should be taken out of the province of *Croson* because the statute did not classify on the basis of race [or gender]. The court's reasoning was that "neither the language of the relevant state and federal statutes and regulations nor the state's description of the operation of the program suggests that the classification of the challenged program are indeed based on the non-invidious and non-suspect classification of disadvantage." *Id.* at 1023–24. Judge Crabb reached this conclusion after finding that for all practical purposes, under the statute, all members of minority groups are irrebuttably presumed socially disadvantaged.[6] Although Judge Crabb did find that the presumption that a woman or a member of a minority group is economically disadvantaged "can be and has been challenged successfully," *id.* at 1025, the court held that since race, national origin and gender are proxies for socially disadvantaged, the underlying classification is based on invidious categories. The court thus used the *Croson* standard to

---

5. The Wisconsin statute is similar to the Philadelphia DBE set-aside. It provides that to bid for the $4 million of contracts reserved for disadvantaged businesses, a firm must establish that it qualifies as a socially and economically disadvantaged business.

6. The court found that the only way a challenger might be able to rebut the presumption of social disadvantage is by demonstrating "that for all practical purposes the applicant is not a member of the minority group to which he or she claims to belong." *Id.* at 1026.

evaluate the plaintiffs' likelihood of success on the equal protection claim.[7]

■ Defendants' attempt to differentiate the Ordinance from the statute under attack in *Milwaukee Co. Pavers* must fail. Defendants argue that Wisconsin's statute uses racial, ethnic and gender characteristics to define socially and economically disadvantaged persons, whereas the Philadelphia ordinance defines preferred persons not in terms of ancestral or ethnic qualities, but by the disadvantaged status of its ownership and in terms of the size of its business. This court rejects defendants' claim that the Philadelphia Ordinance does not define preferred status based on race, ethnicity, gender or handicap.

First, according to the definition of "socially and economically disadvantaged individuals" in § 17–501(11), *see supra* pp. 1280–81, even if the court accepts the defendants' argument that the presumption that all minorities, women and handicapped are socially and economically disadvantaged is rebuttable, and thus that all minorities, women and handicapped are *not* entitled to preferred treatment, the fact remains that under the definition *only* minorities, women and handicapped can ever be granted preferred status. Thus, as the court reads the definition in § 17–501(11), a non-minority, non-female or non-handicapped business owner, who otherwise has been unable "to compete in the free enterprise system … due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged" would not be entitled to preferred treatment. This indicates to the court that labelling the preferred class "socially and economically disadvantaged individuals" is simply an exercise in advancing form over substance.

Second, in support of its finding that the DBE preference is really a racial-, gender- and handicapped-based classification, the court points to the transcript of the hearing held Wednesday, April 29, 1987 on Bill No. 1260. As discussed *supra* pp. 1280–81, Bill No. 1260 incorporated the DBE concept utilized in federal set-asides in place of the existing independent set-asides of 15% for MBEs and 10% for FBEs. At the April 29, 1987 hearing, the city council ultimately rejected combining the separate MBE and FBE goals into one 25% set-aside. Instead, the city council maintained separate contracting goals for MBEs and FBEs. *See* Transcript, April 29, 1987, at 553. Despite the label "disadvantaged business enterprise" given to the preferred class, the court has trouble agreeing that a program that sets aside 15% of city contracts for minority-owned businesses and 10% of its contracts for female-owned business does not define preferred status based on race or gender.

The court finds that the DBE concept is a cosmetic endeavor designed to camouflage a race-, ethnicity- and gender-based ordinance. Having decided to maintain the separate goals for MBEs and FBEs, some of the councilmembers expressed concern about the potential irrelevance of the DBE concept. Stanford Hines responded that the purpose of the DBE classification was to prevent the "well-heeled minority business owner or a female who succeeded in ownership of a profitable business from her father or her husband or her uncle" from being entitled to a preference under the set-aside program. *See id.* at 549. The court does not believe that this announced purpose serves to take the Ordinance out of the realm of racial- and gender-based classifications.

In addition, defendants argue that since § 17–501(10)(b) provides that businesses receiving more than five million dollars of contract work with the city are ineligible even if the owners are minority or females, the classification of economically disadvantaged is rebuttable. This argument does not rescue defendants' contention that the Ordinance does not classify on the basis of race or gender. Under the Ordinance such businesses are not "ineligible" for preferred treatment. Rather the MBEC "shall

---

**7.** In its decision to apply the *Croson* standard to the Wisconsin "disadvantaged business statue," the court held that *Croson* is applicable to classifications based on gender, as well as race and ethnicity.

make a rebuttable presumption that the concern is not a disadvantaged business enterprise." § 17–501(10)(b). Thus, defendants' claim that this five million dollar threshold shows that the Ordinance, unlike the Milwaukee Statute, excludes those businesses whether or not minority-owned or female-owned that suffered no disadvantage, is unfounded. Furthermore, the fact that the classification of "economically disadvantaged" is rebuttable does not lead to a different result from *Milwaukee Co. Pavers.* There the court found that the statute defined the preferred class based on race, ethnicity or gender despite the fact that the presumption of economic disadvantage of those persons was found to be rebuttable. *See supra* p. 1293. In addition, the court questions whether setting the cut-off point at a total of five million dollars of previous awards of city contract work really creates a "rebuttable presumption." It seems to the court that the threshold is so high that requiring a challenger to make that showing is equivalent to mandating a showing that an applicant "is not a member of the minority group to which he or she claims to belong"—a showing so burdensome that the court in *Milwaukee Co. Pavers* found the presumption to be irrebuttable. *Milwaukee Co. Pavers,* 707 F.Supp. at 1026.

For the above reasons, defendant has failed to persuade the court that its "Disadvantaged Business Enterprise" set-aside is not merely a race-, ethnicity- or gender-based classification by another name. Therefore, as in *Milwaukee Co. Pavers,* because this court finds that the preference in the Ordinance determines eligibility on the basis of invidious and suspect classifications of race and ethnicity,[8] the court will follow the standard articulated in *Croson* to analyze the constitutionality of the Philadelphia Ordinance. *See, e.g., United Fence and Guard Rail Corp. v. Mario M. Cuomo,* 878 F.2d 588 (2d Cir.1989); *Milwaukee Co. Pavers, supra.*

Because the court can dispose of all matters before it in an examination of plaintiffs' claim under 42 U.S.C. § 1983 that the

Philadelphia Ordinance violated their rights under the Equal Protection Clause of the United States Constitution, the court will not address plaintiffs' claims under title 42 U.S.C. § 1981, article I, §§ 26 and 28 of the Pennsylvania Constitution, title 73 P.S. § 1622, and § 8–200 of the Philadelphia Home Rule Charter.

### 1. Race and Ethnicity

#### a. Race

As discussed above, *see supra* pp. 1289–90, the Supreme Court has made it clear that race-based set-aside programs must be evaluated under the strict scrutiny standard. The decision in *Croson* to subject racial classifications to the strict scrutiny standard is not new. Previous cases have used this difficult standard to test the constitutionality of benign and invidious racial classifications. *See United States v. Carolene Products, Co.,* 304 U.S. 144, 152–53, n. 4, 58 S.Ct. 778, 783–84, n. 4, 82 L.Ed. 1234 (1938) (first suggests strict scrutiny of legislation affecting "discrete and insular" minorities); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) (first enunciates strict scrutiny standard for race-based classifications despite upholding World War II internment of Japanese–Americans); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (applies strict scrutiny under Equal Protection Clause to reject "separate but equal" doctrine in public schools). However, the *Croson* decision does not focus on the choice of level of equal protection review. Instead, the plurality opinion is centered on a discussion of the difficult level of proof with which a government must comply to pass muster under the strict scrutiny test. The focus seems to be on the methodology and process a government must employ in enacting a set-aside provision. In particular the court emphasizes the precise nature of evidence that a government must consider. The court is equally clear about the type of evidence a government must avoid. Thus, in evaluat-

---

**8.** The applicability of the *Croson* analysis to the gender-based classifications in the Ordinance

are dealt with in section 2, *infra.*

ing the constitutionality of the Philadelphia Ordinance, in addition to applying the strict scrutiny standard, this court must bear in mind what it believes to be the philosophy imbedded in the *Croson* opinion; the notion that a set-aside program will defeat an equal protection challenge only if there is specific evidence of systematic prior discrimination in the industry in question by that governmental unit.

To determine if the race-based classifications in the Ordinance comply with the *Croson* standard, the Court has examined over 800 pages of testimony documented in the legislative record provided by the parties. Having done so, the court has concluded, for the following reasons, that the Ordinance suffers from the same defects as did the Richmond Plan in *Croson*.

The strict scrutiny standard requires that the goal of the classification be a compelling state interest and that the means chosen be narrowly tailored to effect that purpose. The first inquiry is thus whether the goal of the Philadelphia city council qualifies as a compelling state interest. Under *Croson*, the level of proof required of the city to demonstrate a compelling state interest is enormous. The city council appeared to have several "interests" in mind when enacting the Ordinance, each of which is laudable. The council sought, *inter alia*, to encourage minority participation in city contract awards; to provide equitable opportunities to participate in city contracts; to encourage full employment among citizens of Philadelphia; to remedy a pattern of past and present discrimination; and to encourage the growth of minority businesses. *See* Preamble, Bill No. 1260.

■ Although the court believes these goals to be commendable, the court cannot find that defendants have shown with particularity the specific instances of discrimination required by *Croson* to support a finding of a "compelling state interest." In other words, under *Croson*, it is not merely enough to espouse urgent goals and

present them as objectives of the legislation. Rather, a local government seeking to enact a race-based set-aside program must rely on specific identified evidence of prior systematic discrimination by that government and then determine that the goal is "compelling" *solely* on the basis of that evidence. Here, the city council appears to have relied precisely on the type of evidence that led the Supreme Court to invalidate the Richmond Plan.

■ First, the Philadelphia Ordinance declared itself to be remedial. The preamble of Bill No. 1260 states that a purpose of the Ordinance is the eradication of present manifestations of discrimination in the procurement of city contracts. Other avowed goals are the establishment of economic parity between minority and majority businesses and the elimination of minority unemployment in Philadelphia. Congressman William H. Gray, III also testified that the Ordinance was "a proposal aimed at redressing the effects of years of racism and isolationism experienced by Philadelphia's minority business community, in their efforts to fully participate in the city's procurement and contracting activity." Transcript, Feb. 17, 1982, at 9. Although the *Croson* plurality stated that classifications based on race must be strictly reserved for remedial settings, the Court held that it is not sufficient for an ordinance to merely declare itself to be remedial, and that such recitation of benign or legitimate purposes should be accorded little weight. This court also points out that the stated goal of encouraging the development of MBEs is not permissible under *Croson*.[9]

■ Second, several witnesses testifying before the city council in support of the Ordinance presented conclusory views that there had been discrimination in the construction industry in the Philadelphia area, in the state and around the nation. Beverly Harper, President of the Brain Trust, a minority business action group, testified:

---

**9.** This is not to say that encouraging the development of new MBEs is not a worthwhile goal. The city may work to that end, but it must choose a neutral means to accomplish its objective.

[If] cities in every other part of this country can institute set-asides, then surely Philadelphia can too.... We don't really want to wait until this legislation goes through the political process. The situation is so dreadful that something can and should be done immediately.

Transcript, Feb. 17, 1982, at 90–91. Benjamin Brown, Executive Vice President of Systems Research Co. stated that "surely 40 percent of Philadelphia's population cannot be ignored economically as it has been from a procurement perspective for all these years." *Id.* at 113. Congressman Gray pointed to an "increased mood in Washington, D.C., states and local governments of indifference, antipathy and hostility toward societal and governmental initiatives aimed at redressing over 200 years of repression and racism in this country ... that has relegated minorities motionless in their quest for social and economic parity." *Id.* at 232. He also described years of "insensitivity and injustice" toward minority businesses. *Id.* at 234. The city council relied on a study compiled by Mark Battle Associates that examines the set-aside process in general and has been used by "minority businesses nationwide ... to support set-aside legislation and the continuation of minority business and economic development programming." *Id.* at 22. Congressman Gray discussed the existence of "societal" discrimination against minorities. *Id.* at 27. In *Croson,* the Court stated that similar evidence submitted as justification for the Richmond Plan was of little probative value in establishing identified discrimination in the Richmond construction industry. Accordingly, this court finds that such statements pervading the record cannot form the basis of a conclusion that the city council's interest was "compelling" within the meaning of the strict scrutiny test.

Because the record is replete with such testimony that cannot form the basis for a set-aside program, the court must reject defendants' argument that the record reflected sufficient evidence to sustain a finding that the need was compelling. However, the defendants are not incorrect in arguing that the city had before it some specific evidence of prior discrimination in the awarding of city contracts. Having examined the entire record, the court did find several portions of testimony documenting incidents where identified minority business owners felt they had been excluded from contracting opportunities on the basis of race. Some of this testimony appears to be precisely what the *Croson* Court required governments to consider in lawfully enacting a race-based set-aside program. *See* Testimony of Leonard Killebrew, Wayne Levy, Henry Settle and Kenneth Gordon Brinkley, *id.* at 119–22, 168–77, 207–09, 295–96. Although such evidence is pertinent and should be considered by the city council in the event it seeks to reenact the Ordinance in compliance with *Croson,* the court finds that it was other evidence of the type deemed impermissible by the Supreme Court that overwhelmingly formed the basis for the enactment of the Ordinance. The record contains so much unsupported general testimony about the problem of discrimination, *see supra* pp. 1295–96, as well as impermissible statistics and information on the national set-aside program, *see infra* pp. 1297–98, that the court finds it was most likely impossible and certainly unlikely that such forbidden evidence did not taint the minds of city councilmembers. In addition, *Croson* requires that the evidence of exclusion must be shown to be systematic, rather than sporadic or isolated events. *Croson,* 109 S.Ct. at 729.

Third, the city council relied on the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Philadelphia. Congressman Gray stated:

Out of some $975.6 million in City funded procurement over the past three years, minority Philadelphia firms who were available, and I would also add capable of doing the work, received a paltry $774,000 in contracts, or a dismal one-ninth of one percent ... Now if minorities make up more than 40 percent of the total population, ... a return to our community of only $774,000 in City funded

contracts is not only fundamentally inequitable but also unacceptable.

Transcript, Feb. 17, 1982, at 14–15. In *Croson* the Court stated that in such a situation where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task, and thus, comparisons to the general population have little probative value. *Croson*, 109 S.Ct. at 725. Congressman Gray's statement makes such a comparison.

The *Croson* Court was particularly concerned with the fact that "the city [did] not even know how many MBEs in the relevant market are qualified to undertake prime or subcontracting work in public construction projects." *Id.* The following statement by Carl Singley, a drafter of Bill No. 343, indicates that the statistical evidence before the Philadelphia city council is flawed in much the same way as that rejected in *Croson:*

> [W]e felt at the time of the drafting that there was not sufficient data available to this Council that would indicate the number of minority businesses that currently exist in Philadelphia and within the surrounding area that would be capable of performing the contracts that the City lets on an annual basis. So the thought in this legislation would first be to ... arrive at essentially ball park figures for percentage purposes, looking at what we felt was a rough approximation, given the absence of a formal survey of our inventory, of the number of businesses capable of performing in the four areas discussed in the ordinance.

Transcript, Feb. 17, 1982, at 42. In addition, like the Richmond city council, the Philadelphia city council failed to examine the level of minority participation in subcontracting, an analysis necessary to gain an accurate picture of minority representation in the city's construction expenditures. The city council clearly lacked sufficient information to enable it to use statistics to demonstrate discriminatory exclusion. *See Croson*, 109 S.Ct. at 725.

Finally, as demonstrated by the following two passages, the city council relied on Congress' finding in connection with the set-aside approved in *Fullilove* that there had been nationwide discrimination in the construction industry. Ernest Edwards, President of Uniland Corporation, a construction, development and property management company, testified as follows:

> The Federal Government uses a ten percent set-aside of work for minorities in the construction industry because we represent approximately ten percent of the national population. On that basis, with the minority community, blacks and hispanics, representing over 50 percent of the City of Philadelphia, we should be here seeking at least a 50 percent set-aside, rather than a 15 percent set-aside.

Transcript, Feb. 17, 1982, at 177–78. In addition, Congressman Parren J. Mitchell (D–MD) stated:

> ... Some may argue that quotas are unconstitutional. The bill before you today does not set quotas. It does however establish goals. The US Supreme Court in the 1980 case of *Fullilove v. Klutznick* handed down a land-mark decision. The Justices held that Congress could mandate that a percentage of local public works contract dollars be set aside for minority business. This case resulted from an amendment I introduced in 1977 to the local public works act requiring the economic development administration to set-aside 10% of its local public works contracts for minority business. This case, I believe, will provide you with the legal support for Bill No. 343. Thus the issue before you today should not be a legal issue but one of policy.

*Id.* at 239. Such reliance on nationwide findings of discrimination is of limited probative value. *Croson*, 109 S.Ct. at 726. As discussed above, the *Croson* court specifically held that Congress has unique powers under § 5 of the Fourteenth Amendment to make findings of discrimination to ensure that the expenditure of federal funds does not foster prior discrimination. The Supreme Court has made it clear that states and localities have less latitude in enacting race-conscious remedial

relief. They may do so only after specific identification of discriminatory spending practices with specificity. Because *Croson* held that localities may not properly rely on Congressional findings of nationwide discrimination, this court must likewise reject such evidence presented to the Council of the City of Philadelphia.

In conclusion, the evidence before the city council did not enable it to demonstrate a compelling interest in keeping with the stringent standard of proof adopted in *Croson*. In fact, the record demonstrates that the Philadelphia Ordinance possesses four of the five characteristics fatal to the constitutionality of the Richmond Plan. The court finds that the city council failed to consider sufficient evidence of identified discrimination in the Philadelphia construction contract procurement process, and that the council was instead influenced by evidence that has been held to be an insufficient basis for race-based set-aside programs. *See Croson, supra.* Accordingly, the defendants fail to meet the first prong of the strict scrutiny test.

Although it is not necessary to analyze whether defendants have complied with the second prong of the test, the court will do so to provide guidance to the city should it seek to reenact the Ordinance.

█ To be upheld under the strict scrutiny test, not only must the Ordinance be enacted pursuant to a compelling state interest, it must also be narrowly tailored to effect that interest. In concluding that the Richmond Plan was not narrowly tailored, the Supreme Court pointed to two unacceptable characteristics of the program that burden the Philadelphia Ordinance as well.

█ First, the *Croson* Court noted that the Richmond city council gave no apparent consideration to using race-neutral means to increase minority business participation in Richmond contracting. The same holds

true for the Philadelphia Ordinance. There is no indication in the record that the city council considered any alternative to the race-based classification they adopted to solve the problem of low participation of MBEs in city contracting. A number of witnesses testified that nondiscriminatory factors prevented successful development and utilization of minority contractors.[10] Had the city investigated the alternatives targeted to overcome these non-racial factors and then found it necessary to reject them because they were not viable or practical, it would be more likely that the chosen means would be deemed narrowly tailored.

Second, the *Croson* court based its finding that the Richmond Plan failed to withstand strict scrutiny in part on its finding that the 30% quota was not narrowly tailored to any goal, except outright racial balancing. Although the Philadelphia Ordinance's 15% set-aside does not appear to be an attempt to achieve "outright racial balancing," the record does not indicate that it is tied to any legitimate goal whatsoever. The *Croson* Court believed that in choosing a percentage quota, the city must only provide remedial relief to those who have been shown to have suffered the effects of previous discrimination. *Croson*, 109 S.Ct. at 729. Councilwoman Specter herself admitted that the choice of the 15% set-aside was arbitrary. *See infra* pp. 1306, 1309. One of the drafters of the Ordinance freely stated that the city did not even know the number of capable MBEs existing in the Philadelphia area at the time the Ordinance was enacted. *See supra* p. 1297. At one point, the city council even considered merging the 15% goal for MBEs and the 10% goal for FBEs into one 25% set-aside. The city's decision to maintain the separate goals was not motivated by any specific information on what precise breakdown would be justified or realistic; rather the

---

**10.** *E.g.,* Congressman Gray ("quite simply, high interest rates are literally killing off small and minority businesses at record rates"), Transcript, Feb. 17, 1982, at 11; Carl Singley, (lack of prior experience and other admittedly "race-neutral" qualifications), *id.* at 63; Ernest Edwards (corruption, collusion among larger firms, mismanagement by city officials and the absence of a fair and adequate system for bid notification), *id.* at 172–73; Ronald White (lack of bargaining power with manufacturers, which larger contractors possess), *id.* at 201; Leroy Quarles (lack of manufacturing capacity), *id.* at 214–15.

decision was essentially a political decision motivated by pressure from some councilmembers to maintain a distinct, albeit arbitrary, goal for FBEs. *See* Transcript, April 29, 1987, at 532–34. Moreover, the existence of a case-by-case waiver system in which a business may, under certain circumstances, be excused from complying with the set-aside, does not render the chosen percentage narrowly tailored.

In addition, there was a great deal of testimony about the problem of fraudulent or "front" MBEs established to enable non-MBEs to reap the benefits of the 15% set-aside. The development of these front MBEs is apparently encouraged by the inability of legitimate MBEs to reach the goals set by the Ordinance. *See id.* at 581. The fact that there exists a gap between the amount of the set-aside and the number of capable MBEs such that non-MBEs are developing front businesses to be eligible for preferred status, is a clear indication that the city did not adequately determine a narrowly tailored solution to the perceived problem of discrimination in the city procurement process.

The court does note that, unlike the Supreme Court's finding with regard to the Richmond Plan, the Philadelphia city council attempted to tailor its remedy in one respect. Under the Richmond Plan, a successful black entrepreneur from anywhere in the country enjoyed an absolute preference over other citizens based solely on their race. The Philadelphia city council defined DBEs to provide that MBEs that have received more than five million dollars in city contracts are automatically excluded from the set-aside. Although this is certainly a valid attempt to prevent some MBEs that do not need the benefit of the set-aside from participation, it by no means ensures that all "well-heeled" MBEs will be exempt. The record gave no indication of the genesis of the five million dollar figure, or whether that number was itself tailored to achieving the desired goal. Thus, the existence of the five million dollar cut-off does not convince the court that the arbitrary choice of a 15% set-aside is narrowly tailored. Accordingly, the Ordinance fails both prongs of the strict scrutiny test.

### b. *Ethnicity*

■ In addition to Blacks, the Ordinance also includes Hispanics, Asian Americans, American Indians and Alaskan Natives in its definition of "minority persons," and thus contains classifications based on ethnicity. The strict scrutiny standard applicable to race-based classifications is also used to evaluate ethnicity-based classifications. *Croson*, 109 S.Ct. at 727–28. Whatever the ambiguities of the *Croson* opinion and the various concurrences, it is clear that a majority of the Court believes that state laws employing racial and ethnic classifications must be supported by specific evidence of discrimination in the state against those aided by the statute and be narrowly tailored to remedy those past wrongs. *Milwaukee Co. Pavers*, 707 F.Supp. 1016, 1028 (W.D.Wisc.1989), *citing*, *Croson*, 109 S.Ct. at 723–29.

■ Employing this standard, the *Croson* court struck down the Richmond set-aside as applied to Spanish-speaking, Oriental, Indian, Eskimo or Aleut persons. As in *Croson*, there is no evidence whatsoever in the legislative history of the Philadelphia Ordinance that an American Indian, Eskimo, Aleut or Native Hawaiian as ever been discriminated against in the procurement of city contracts. Nor is there any evidence that any such individuals even own businesses in Philadelphia. This random inclusion of ethnic groups in the preferred class without any evidence of discrimination against these groups militates strongly against a finding that the classifications are remedial. Thus, the court finds that the ethnicity-based classifications fail to withstand strict scrutiny in violation of the Equal Protection Clause.

### 2. *Gender*

The Philadelphia Ordinance includes not only race- and ethnicity-based classifications, but gender based classifications as well. The *Croson* court did not address the question of what standard should be applied to assess the validity of classifica-

tions based on gender in the affirmative action context.

Prior to *Croson,* this Circuit consistently held that the appropriate standard of review to be applied by the courts in equal protection analysis is determined by reference to the nature of the right affected by the classification and the identity of the class burdened. *Medora v. Calutti,* 602 F.2d 1149, 1154 (3d Cir.1979). In addition, also prior to *Croson,* strict scrutiny, the highest level of scrutiny, was always reserved for classifications based on race, national origin or ethnicity, and never applied to classifications based on sex. *Main Line Paving, supra,* at 1356.

The *Croson* opinion gives no indication that the strict scrutiny analysis applied to remedial race- and ethnicity-based classifications was intended to be applied to other remedial forms of classification. The search for the appropriate standard to be applied to gender-based classifications must reach to cases preceding *Croson.* A long line of prior Supreme Court cases has varied the equal protection analysis applied to different classifications. *See Wygant, supra* (where the court applied strict scrutiny analysis to race-based and ethnicity-based classifications); *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (where the Court applied intermediate scrutiny to gender-based classifications); *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (where the Court applied a rational basis test to classification of mentally retarded individuals).

In evaluating gender-based classifications that operate to disadvantage women the Court has used a standard of review less difficult than the strict scrutiny test employed to analyze race-based and ethnicity-based classifications [hereinafter "intermediate scrutiny"]. This analysis requires the state to demonstrate an important governmental interest and a means that bear a fair and substantial relation to achieving that objective. *Craig v. Boren,* 429 U.S. 190, 211, 97 S.Ct. 451, 464, 50 L.Ed.2d 397 (Powell, J., concurring). The Court has also expressed the test as requiring an "exceedingly persuasive justification" for classifications based on gender. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). The gender-based classifications at issue in the Philadelphia Ordinance serve to disadvantage men, and thus put the question of the appropriate standard in a different light.

However, in the affirmative action setting the Supreme Court has also evaluated gender-based classifications that disadvantage men under intermediate scrutiny. In *Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1978) the Court examined the constitutionality of Alabama alimony statutes providing that husbands, but not wives, may be required to pay alimony upon divorce. The Court expressed its view that even gender-based classifications designed to benefit women by compensating them for the effects of prior discrimination must withstand intermediate scrutiny. *Id.* at 283, 99 S.Ct. at 1114. *See also Caban v. Mohammed,* 441 U.S. 380, 394, 99 S.Ct. 1760, 1769, 60 L.Ed.2d 297 (1979) (Court used intermediate scrutiny to evaluate a New York domestic relations law permitting an unwed mother, but not an unwed father, to block the adoption of their child simply by withholding her consent). The Court inquired whether the gender classifications served "important governmental objectives" and were "substantially related to the achievement of those objectives." *Id.* at 279, 99 S.Ct. at 1111. The Court held that the statute was unconstitutional after determining that it failed the latter prong of the intermediate scrutiny test.

In another case, somewhat more analogous to the FBE set-aside before this court, the Supreme Court struck down the policy of a state-supported university that denied otherwise qualified males the right to enroll for credit in its School of Nursing. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1981). In evaluating the state's "educational affirmative action" program, the Court acknowledged that in limited circumstances a gender-based classification favoring one sex can be justified

if it intentionally and directly assists members of the sex that is disproportionally burdened. *Id.* at 728, 102 S.Ct. at 3338. The state must show that members of the gender benefitted by the classification actually suffer a disadvantage related to the classification. The Court reiterated that the mere assertion of a compensatory purpose will not automatically shield the classification from scrutiny; rather, the scheme must withstand intermediate scrutiny. This intermediate scrutiny will serve to weed out those classifications with objectives that themselves reflect archaic and stereotypical notions. *Id.* at 725, 102 S.Ct. at 3336. Engaging in intermediate scrutiny, the Court concluded that the state had failed to establish the "exceedingly persuasive justification" needed to sustain the classification. *Id.* at 731, 102 S.Ct. at 3340. *Compare Califano v. Webster*, 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (where the Court upheld against intermediate scrutiny analysis a statutory classification allowing women to eliminate more low-earning years than men for purposes of computing Social Security benefits, finding that the scheme took into account that women "as such have been unfairly hindered from earning as much as men" and "work[ed] directly to remedy" the resulting economic disparity).

Since the *Croson* decision, a few courts faced with a challenge to an affirmative action program for female-owned businesses have inquired into the appropriate standard of review. In *Main Line Paving Co., Inc. v. Board of Education*, 725 F.Supp. 1349 (E.D.Pa.1989). Judge Weiner ruled that the appropriate standard for evaluating gender-based classifications instituted by the Philadelphia School Board is the intermediate scrutiny analysis announced by the United States Supreme Court in *Reed v. Reed, supra* and *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Judge Weiner relied on the fact that the Supreme Court has consistently applied intermediate scrutiny to classifications based on gender and his belief that *Croson* did not alter this analysis.

The *Main Line Paving* opinion also relied on a pre-*Croson* Ninth Circuit decision applying intermediate scrutiny to a remedial gender-based classification. *Associated General Contractors of California v. City and County of San Francisco*, 813 F.2d 922 (9th Cir.1987). The Ninth Circuit held that classifications based on gender require an "exceedingly persuasive justification" because "a thin line divides governmental actions that help correct the effect of invidious discrimination from those that reinforce the harmful notion that women need help because they can't make it on their own." *Id.* at 939. The court found that helping women overcome the adverse effects of discrimination was a sufficiently important objective to justify the limited use of a gender-based remedial classification. However, the court determined that the scope of the remedy was over-broad and that the defendant had not demonstrated that women were disadvantaged in each of the industries covered by the ordinance. *Id.* at 941.

In another pre-*Croson* decision, the Sixth Circuit applied the intermediate scrutiny standard to a Michigan law creating a preference for female-owned business enterprises, and held that the preferences "cannot withstand constitutional attack since evidence of record that the State discriminated against women [was] non-existent." *Michigan Road Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583 (6th Cir.1987). The court found that defendants' reliance upon general assertions of societal discrimination were insufficient to satisfy their burden absent some indication that the "members of the gender benefitted by the classification actually suffer[ed] a disadvantage related to the classification." *Id., citing, Mississippi Univ. for Women*, 458 U.S. at 728, 102 S.Ct. at 3338. In addition, the court found that defendants presented no evidence that FBEs suffered a disadvantage in competing for state contracts, and accordingly struck down the ordinance.

■ Having examined the pre-*Croson* cases where the Supreme Court analyzed the constitutionality of statutes or policies disadvantaging men and found that in each of these cases the Court subjects the classifications to intermediate scrutiny, this

court will examine the FBE set-aside in the Philadelphia Ordinance under that standard. The *Croson* opinion does not state that the strict scrutiny test applied to race- and ethnicity-based classifications should be used to analyze gender-based set-asides as well. In fact, when the *Michigan Road Builders* case was before the Supreme Court, the Court affirmed the opinion in light of its decision in *Croson*. The Court thus apparently believes that the *Croson* decision does not alter the application of intermediate scrutiny to gender-based classifications. Finally, the three post-*Croson* cases that use strict scrutiny to evaluate gender-based set-asides do not persuade this court that the decision to engage in intermediate scrutiny is incorrect. *See Conlin v. Blanchard*, 890 F.2d 811 (6th Cir.1989); *The Cone Corporation v. Hillsborough County*, 723 F.Supp. 669 (M.D. Fla.1989); *American Subcontractors Ass'n v. The City of Atlanta*, 259 Ga. 14, 376 S.E.2d 662 (1989). In none of these cases does the court acknowledge that its decision to apply strict scrutiny to gender-based classifications is a departure from prior Supreme Court cases. Nor do the cases provide support for the decision to do so. Instead, they cite *Croson* for the proposition that strict scrutiny is appropriate, but fail to identify where in the opinion that support can be found. The court thus finds these cases unpersuasive.

The decision to apply intermediate scrutiny to the FBE set-aside in the Ordinance is not without its problems. First, this court embraces the concern Justice Stevens expresses in his concurring opinion in *Croson*. *Croson*, like this case, involves an attempt by a legislative body—rather than a court—to construct a remedy for a past wrong. Justice Stevens points out that the province of a legislative body is the promulgation of rules to govern *future* conduct, and therefore takes issue with "the use of the political process to punish or characterize past conduct of private citizens." *Croson*, 109 S.Ct. at 731 (Stevens, J., concurring). Instead, Justice Stevens opines that "it is the judicial system, rather than the legislative process, that is best equipped to identify past wrongdoers and to fashion remedies that will create the conditions that presumably would have existed had no wrong been committed." *Id.* at 731–32. Justice Stevens expressed this opinion in the context of the *Croson* decision that subjected the remedy at issue to strict scrutiny. Surely, this concern with the legislature's exercise of remedial powers is even more pronounced where the level of review of that power is the lesser standard of intermediate scrutiny.

Second, the use of intermediate scrutiny to analyze gender-based classifications in the affirmative action context produces an anomalous result. In the non-affirmative action context the use of a three-tiered analysis for ordinances disadvantaging blacks, women or non-suspect classifications creates the result intended by the Supreme Court—it is most difficult to uphold a classification disadvantaging blacks, less difficult to uphold a classification disadvantaging women, and easiest to uphold a classification disadvantaging a non-suspect class. However, in the affirmative action setting the use of this three-tiered scheme means that laws disadvantaging whites (MBEs) will be held to a stricter standard than laws disadvantaging men (FBEs). The flip-side of this is that under the sliding scale analysis, it becomes easier for a state legislature or a city council to pass an FBE than an MBE, because the former will be held to a lesser standard of scrutiny by the courts.

This court questions whether this result was intended The anomaly lies in the fact that the three-tiered scheme sprung from the judicial determination that, as a class, blacks have been subjected to the most egregious discrimination over time. *See, e.g., Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). This determination is reflected in the choice of higher percentages for minorities in the Philadelphia Ordinance and other similar set-aside programs. The very existence of the Thirteenth and Fifteenth Amendments to the United States Constitution evinces a Congressional intent to give itself the pow-

er to redress past discrimination against blacks.[11]

However, a look at the Supreme Court decisions holding that laws disadvantaging blacks *and whites* should be held to the same strict standard, *see Croson, supra,* and that laws disadvantaging women *and men* should be held to the same intermediate standard, *see Craig v. Boren, supra,* may explain or justify this anomalous result. Perhaps by determining that discrimination against whites and discrimination against blacks is equally abhorrent and that the criteria of race is "more suspect" than gender discrimination, the Supreme Court has accepted the result that it is now more difficult to remedy race discrimination than sex discrimination. Whether it has or not, this court questions the logic of such a result.

Third, the *Croson* decision sent a powerful message that affirmative action and quotas are highly suspect. Although *Croson* plainly did not express its views on gender-based classifications, many of the Court's concerns are equally applicable to gender-based affirmative action programs. It may be that the logical extension of that case would be to view gender-based set-asides with the same critical eye as race-based set-asides.

Fourth, the application of the three-tiered framework—and intermediate scrutiny in particular—itself presents a problem. As the court stated in *Associated General Contractors, supra,* intermediate review provides "relatively little guidance in individual cases," *id.* at 939, *quoting,* Note, *Madisonian Interpretation of the Equal Protection Doctrine,* 91 Yale L.J. 1403, 1412 (1982). The continuum provides the court with "buzz words" (*i.e.* "compelling state interest," "important governmental interest" and "rational basis") that in practice are at times both difficult to distinguish and to apply. The three-tiered scheme, or "continuum" sometimes forces courts to make defined formulas fit ill-de-

fined circumstances, possibly leading to result oriented decision-making.

Moreover, it is not so clear to this court that the Equal Protection Clause mandates this scheme. Justice Stevens raised this point in his concurrence in *Craig v. Boren:*

> There is only one Equal Protection Clause. It requires every State to govern impartially. It does not direct the courts to apply one standard of review in some cases and a different standard in other cases.

429 U.S. at 211–12, 97 S.Ct. at 464 (Stevens, J., concurring). Justice Stevens believes that at least strict scrutiny and intermediate scrutiny really amount to the application of a single standard. *Id.* In *Cleburne,* where the Court articulated yet a third standard of review—the rational basis test—he suggests that the lowest test alone could effectively weed out classifications violating the Equal Protection Clause without resort to either of the two heightened scrutiny tests. *Cleburne,* 473 U.S. at 452–53, 105 S.Ct. 3260–61 (Stevens, J., concurring).

The case before this court highlights the problem of the merging of three tests into one standard that Justice Stevens expressed in his concurring opinion in *Cleburne.* As will be discussed below, *see infra* p. 1304, the *Croson* decision voiced the opinion of the court that specific evidence is required to enact remedial set-asides. Although in *Croson* this requirement was expressed as the "compelling state interest" prong of the strict scrutiny standard used to evaluate an MBE, this court feels the specific evidence requirement cannot be ignored even in the evaluation of an FBE or HBE. As may become apparent, the result of bearing in mind the need for specific evidence while conducting examinations of the FBE under the intermediate test and the HBE under the rational basis test, is that the analysis begins to take on the appearance of strict scrutiny.

---

**11.** In *The Slaughterhouse Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873), the Supreme Court discusses the purpose of the Reconstruction Amendments: "The freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made free-man and citizen from the oppressions of those who had formerly exercised unlimited dominion over him."

Despite these considerations, the court will examine the FBE at issue in this Ordinance under the intermediate scrutiny standard.

To apply the intermediate scrutiny test to the case at hand, the court must engage in a two part analysis. First, the court must determine the city council's objective, and decide whether it constitutes an "important governmental interest," as opposed to the "compelling state interest" applied to race- and ethnicity-based classifications.

■ The admonition in *Croson* that a city must produce specific identifiable evidence of discrimination against blacks by the city in the procurement process to defeat an equal protection challenge was made applicable only to race-based classifications in that case. Having determined the level of scrutiny to be "intermediate level," the question of whether a government defending a challenge of unconstitutional *gender* discrimination must also meet this rigorous evidentiary requirement appears to be one of first impression. This court believes that the philosophy embraced by the *Croson* court strongly suggests that the Supreme Court's view is that *any* remedial classification, not simply race- or ethnicity-based, must be tied to specific discrimination by the acting governmental entity. This court finds that this evidentiary burden will be greater or lesser depending on the level of scrutiny applied to the given classification. The question then becomes what type of evidence is sufficient to establish an "important governmental interest," as opposed to a "compelling state interest?" Of course, to satisfy the "important governmental interest" test, the amount of specific evidence considered by the city may be lesser than that required by *Croson* for race-based classifications.

The *Croson* court made it clear that suppositions, suggestions or statements that discrimination exists alone cannot justify remedial legislation. Instead, such discrimination must be documented for the record and actually considered by the acting legislative body. Support for the application of this evidentiary requirement to gender-based classifications can be found in the pre-*Croson* decision of *Michigan Road Builders, supra,* where the Sixth Circuit struck down a FBE preference because the state failed to present evidence, other than general assertions, that the state discriminated against women in contract procurement, 834 F.2d at 595.

■ The city's "governmental interest" appears to be the eradication of present manifestations of sex discrimination in city contracting. *See* Preamble, Chapter 17–500. Having examined the entire legislative history before it, the court finds that the record is devoid of specific evidence that the city discriminated against women in its procurement process. Thus, the city has failed to point to a fact supporting an important governmental interest in creating a gender-based preference in its procurement process. In so stating, the court is not saying discrimination in the letting of city contracts does not exist. Nor is the court saying that the dismantling of a discriminatory system is not an important city goal. Rather, the court finds that if such gender discrimination does in fact exist in the letting of city contracts, for the city to remedy that discrimination by developing preferences for FBEs, it must produce and consider evidence of that discrimination in the development of such a remedial program.

It appears from the record that the predominant reason for the inclusion of FBEs in the Philadelphia set-aside ordinance was political compromise. Most of testimony on the FBE preference focused on the effect of such a program on the city's efforts in the area of MBE set-asides. At the February 17, 1982 hearing councilmembers discussed whether women should be included in the Ordinance. There was no specific factual evidence that women have been discriminated against in the procurement and contracting industry in Philadelphia.[12] One

---

12. Congressman William Gray did state that women have been the victims of sexism in our society. Transcript, Feb. 17, 1982, at 27. Such a statement, and others like it, do not provide the court with specific instances of discrimination necessary to establish an important govern-

witness, Rotan Lee, special counsel to Congressman Parren Mitchell, in discussing the question of whether including women among the preferred classes would serve to dilute the strength of the bill with regard to minorities, stated: "... if [the Ordinance] had to include women as opposed to not existing as law, then we should include women." Transcript, Feb. 17, 1982, at 37.

The testimony of Beverly Harper on March 23, 1982, indicated that the addition of a FBE set-aside was principally to increase political support for an affirmative action program in the letting of city contracts:

> I felt that it would broaden our base of support in the community to include women in this legislation. We had an opinion from our lawyers who have worked out of Washington and with other cities in drafting their legislation, and they felt that the fact that we included women added a lot of strength to our piece of legislation that does not exist in several other cities.

Transcript, March 23, 1982, at 358. Councilwoman Specter expressed a similar theme when she stated that even though statistically women businesses are succeeding more than other businesses, if there is no percentage set-aside in the ordinance for women, she warned that "we're going to have a problem." *Id.* at 533.

In addition, the city council relied on statistics indicating that despite the existence of 4,365 women business owners in Philadelphia, less than one half of one percent of all city contracts go to women business owners. The court finds that just as the *Croson* court ruled that similar statistics alone do not prove widespread historical discrimination against minorities, scattershot numbers are not a substitute for evidence of discrimination against women in the procurement of contracts in Philadelphia sufficient to establish an "important governmental interest."

Other than the generalized statements that women have been discriminated against in the letting of city contracts, *see supra* n. 12, the city had before it no actual evidence that this discrimination exists. Although to meet the "important governmental interest" prong of the test the city need not have before it the glaring evidence necessary to satisfy the compelling state interest test with regard to race-based classifications, the city must at least have some evidence, other than hearsay statements and hopeful declarations, that women have been discriminated against in Philadelphia's procurement process. Had the city council heeded the advice of Carl Singley, Professor of Law at Temple University, *see* Transcript, Feb. 17, 1982, at 44, and sought legislative findings to indicate the extent to which women have been discriminated against, the FBE set-aside may have withstood constitutional scrutiny. However, because the record is devoid of such evidence, the court finds that defendants have not shown the "exceedingly persuasive justification" required by the Supreme Court to sustain the gender-based classification contained in the FBE preference. *See supra* p. 1300.

Since the court finds that the city has not demonstrated an important governmental interest it is not necessary to address the second portion of the test. However, as before, the court will discuss the second portion for purpose of guidance in the event the city seeks to reconsider its Ordinance.

The second prong of the intermediate scrutiny test requires the court to determine if the city has shown that the chosen means are substantially related to the important governmental interest. The court must thus decide whether if the city had demonstrated an important governmental interest in establishing a FBE preference, the 10% set-aside would be "substantially related to that goal." Despite the fact that this standard is somewhat less stringent than the "narrowly tailored" re-

---

mental interest in gender-based classifications. Beverly Harper, President of Brain Trust, a minority business action group, testified that she "know[s] specifically that women are discriminated against in City and other kinds of contracting as much as minority businesses are," but gave no evidence of this discrimination. Transcript, March 23, 1982, at 358.

quirement discussed above, *see supra* pp. 1298–99, the court finds that defendants have failed to relate the 10 percent figure to the problem it seeks to remedy.

First, the city council did not know the true number of FBEs in the Philadelphia area. During the March 23, 1982 hearing, Priscilla Chialiastri, owner of a catering business and Chairperson of the Task Force of Women–Owned Business Enterprises of the Mayor's Commission for Women, acknowledged that the survey used to acquire the numbers presented to the city council was conducted in a disorganized and unsystematic fashion. Ms. Chialiastri conceded that the task force determined the number of FBEs by "ask[ing] everybody we knew to turn in the name of a woman business owner to us on an individual basis." Transcript, March 23, 1982, at 350. She also confessed that she did not know if the task force statistics were a hundred percent accurate because they have not all been documented. *Id.* at 351.

Second, there was considerable evidence before the city council that the 10 percent figure was arrived at through political compromise, rather than by an effort to relate the remedy to the wrong. The testimony of Beverly Harper is particularly illustrative:

> We felt that we could—it would be more difficult to demonstrate that women-owned businesses could in fact perform ten percent of the City—more than ten percent of the city contracts. The goals were a compromise. There were a number of people in the Brain Trust who wanted the goals to be much higher. We went through several meetings where we discussed the goals, and I felt that we should go in, a number of people felt that we should go in for higher goals and negotiate down. I felt strongly that we should to in with goals that we thought we could achieve, we could perform and we could sell, and hang tough right there and not even talk about compromise. *Id.* at 360.

Third, when the city council held hearings in 1987 on the amendments establishing a DBE program, there was testimony that since the FBE set-aside was enacted in 1982 there were not enough FBEs to even take up the ten percent of overall city contracting. *See* Testimony of Stanford Hines, Transcript, April 29, 1987, at 529. Councilman Street agreed, stating, "We all know they [FBEs] won't reach the goal. We know they won't reach the goals." *Id.* at 581. In addition, Councilman Street acknowledged that because the FBE percentage was set too high, the Ordinance was promoting wide-spread fraud, stating, "We know there are a lot of women who are coming in who we believe are setup by other people to come and to get this share of the contract …" *Id.*

Finally, during the September, 1988 hearing on Bill No. 108, Councilwoman Specter acknowledged that there was absolutely no attempt on the part of the city council to arrive at a percentage set-aside that was in any way tied to the gender discrimination they were attempting to remedy. She stated:

> We didn't do a study to see whether or not ten percent was proper for women or the percentage for minorities was correct. We know there were a lot of women out there … and they weren't getting their share. And we set a goal. And it was pretty arbitrary. And we sought to encourage. And that's what this does. Transcript, Sept. 27, 1988, at 751.

In addition, the above statement indicates that one goal of the city council was to use the ten percent set-aside to encourage the growth of new FBEs. *See* Testimony of Stanford Hines, Transcript, April 29, 1987, at 533 ("[w]e can hope that women will be more active in creating businesses. And I think *eventually* women will meet the goals that are set …") (emphasis added); *see also* Preamble, Chapter 17–500. This court believes that the *Croson* decision stands for the notion that set-asides cannot constitutionally be used to encourage the development of new businesses, but rather must be strictly remedial. This court agrees that a set-aside goal established to encourage new FBEs is inconsistent with the requirement that such a goal be substantially related to the goal of remedying

gender discrimination. Accordingly, the defendants fail to meet this prong of the intermediate scrutiny test and the FBE set-aside thus violates the Equal Protection clause of the Fourteenth Amendment of the United States Constitution.

### 3. *Handicap*

In addition to creating preferences for minority- and female-owned businesses in the letting of city contracts, the Ordinance also includes a 2% set-aside for handicapped business-owners.

Similar to the above analysis with regard to gender-based discrimination, this court believes that the appropriate test to determine the constitutionality of a set-aside for handicapped individuals can be determined from prior Supreme Court cases concerned with benign or invidious discrimination against such individuals.

█ The Supreme Court has not clearly defined the level of scrutiny to be applied to classifications based upon disability. However, in *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1984) the Court did examine the constitutionality of an ordinance that required special use permits for "hospitals for the feebleminded" and of the city council's denial of such a permit to a group home for the mentally retarded. A majority of the Court in *Cleburne* overturned a Fifth Circuit decision holding that the mentally retarded form a quasi-suspect class entitled to intermediate level or heightened scrutiny. Instead, the Court ruled that legislation that distinguishes between the mentally retarded and others "must be rationally related to a legitimate governmental purpose." Applying this "rational basis test" the Court ruled that the city council deprived the Cleburne Living Center of the equal protection of the laws because the council lacked a rational basis for denying the special permit.[13]

**13.** Accordingly, the Court did not address whether the special use permit provision was facially invalid where the mentally retarded are concerned. Because the court chose only to inquire into the constitutionality of the law as applied, the *Cleburne* decision provides little

Plaintiffs contend that this court should apply the rational basis test employed in *Cleburne* to evaluate the classification based on handicap in the Philadelphia Ordinance. Plaintiffs argue that the *Cleburne* Court suggested this result in *dictum*. In concluding that the Court of Appeals erred in holding mental retardation a quasi-suspect classification, the Supreme Court stated:

> ... if the large and amorphous class of the mentally retarded were deemed quasi-suspect for the reasons given by the Court of Appeals, it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large. One need mention in this respect only the aging, the disabled, the mentally ill, and the infirm. We are reluctant to set out on that course, and we decline to do so.

*Id.* at 445–46, 105 S.Ct. at 3257. Although the Court did not address the issue of the appropriate standard applicable to classifications based on the status of "disabled," this court agrees with plaintiffs that the above language suggests that the decision to use the rational basis test with regard to classifications based upon mental retardation would also apply to classifications based on handicap. Accordingly, this court will examine the two percent set-aside for handicapped individuals under the "rational basis standard."

To be upheld under the rational basis test, the two percent set aside legislation must be "rationally related to a legitimate governmental purpose." *Id.* at 446, 105 S.Ct. at 3258. The rational basis test is the least strict of the three standards by which courts evaluate equal protection challenges. Although this test is intended to

guidance as to how employ the rational basis standard or whether and how to differentiate between different retarded individuals. *Cleburne*, 473 U.S. at 478, 105 S.Ct. at 3274 (Marshall, J., concurring.)

give states wide latitude, the court finds that, as with gender-based classifications, the HBE set-aside must also comply with the evidentiary requirements.

Under the rational basis test, the first inquiry is whether the objective of the city council was legitimate. This court has no trouble concluding that the avowed purpose of the two percent set-aside is legitimate. The announced goal of the Ordinance is to encourage handicapped persons to develop business and participate in the free enterprise system by eliminating barriers to employment, business opportunities, education, and professional advancement of disabled persons. *See* Preamble, Bill No. 108. There was also some discussion at the September 27, 1988 hearing on Bill No. 108 suggesting that another purpose of the set-aside was to remedy prior discrimination. *See* Testimony of Ted Young, Transcript, Sept. 27, 1988, at 725–29. The council heard from several witnesses who testified generally about discrimination against the handicapped in education, employment and professional advancement. *See id.* at 725–47. The court believes that encouraging the development of businesses owned by persons previously excluded from the marketplace, for whatever reason, is an admirable goal for government to pursue.

██ Thus, the two percent set-aside for handicapped individuals meets the first prong of the rational basis test. To meet the second prong of the test, the set-aside must be rationally related to this goal of encouraging the development of handicapped business. This court believes that under *Croson*, the set-aside for HBEs must be supported by some evidence that there was prior discrimination against handicapped businesses in the procurement of city contracts.[14]

In contrast with the testimony offered in support of the FBE set-aside, the evidence presented at the hearing on Bill No. 108 did contain specific instances of discrimination against handicapped individuals.[15] However, to both meet the rational basis test and to satisfy the evidentiary standard required by *Croson*, the city council should have considered evidence of past discrimination against handicapped business enterprises, and not merely discrimination against individuals. The absence of this type of evidence suggests to the court that there was no rational relationship between the city's goal and the creation of a two percent set-aside for HBEs.

Two additional factors lead this court to conclude that the two percent set-aside is not rationally based on the city's stated purpose. First, witnesses and councilmembers present at the hearing on Bill No. 108 acknowledged that no studies were undertaken to determine whether HBEs have in fact been discriminated against in the procurement of city contracts. When Councilman Cohen inquired as to whether "there are any handicapped that [sic] believed they have been denied the benefits of what Bill 108 would give," Ted Young replied that the National Federation of the Blind has not done research on this. In addition, Councilwoman Specter made the following statement:

> ...it is true that there have been no studies done and, as Mr. Young pointed out, studies are good business for some people. We have not made a study in this case. And that's why I asked the question of the people who came here to testify, because they are working in the field ... to get a sense from them as to how many people they feel could participate in this program ...

14. Of course, the evidence need not be as compelling as required for race-based or gender-based classifications.

15. Ted Young, representing the Greater Philadelphia Chapter of the National Federation of the Blind documented several cases of discrimination against blind employees of the City of Philadelphia. These individuals were not, however, involved in the procurement of city contracts. For example, Mr. Young reported that there was a legally blind person working for the city recreation department. This individual came up through the ranks and had attained a second supervisory level. At some point, someone read in the employee's personnel record that he had a vision problem. The employee was then fired. After reviewing the case, the mayor refused to reverse the decision.

Transcript, Sept. 27, 1988, at 749. When the city council decided to encourage the growth of HBEs and remedy a perceived problem of discrimination against handicapped individuals, they had not acquired any information on the number of handicapped individuals who could benefit from the establishment of such a program, or the number of businesses the city could realistically expect to participate in the sheltered market. Without such information, this court cannot find that there is a rational basis for the two percent set-aside.

Second, the transcripts of the September 27, 1988 hearing clearly indicate that the city council's arrival at the two percent figure was arbitrary. Bill No. 108 originally included a one percent set aside. At the hearing, the council discussed the wisdom of an increase to five percent. The hearing was largely an effort to arrive at a compromise. The only evidence that five percent was in any way realistic or advisable was essentially based on supposition or belief of witnesses appearing before the council. Patrick Mitchell, testifying on behalf of the State Vocational Rehabilitation Agency, stated:

> ...I think, with all the disabled individuals out there, that they have skills to cover five percent. In other words, that there are so many skills out there from disabled people in areas and you want to get a good gob done, that you're going to find five percent disabled people out there that can do the job for you.

*Id.* at 742. This is not convincing evidence that the choice of a two percent set-aside is in any way rational or realistic.

Chairman Blackwell capsulized the atmosphere of compromise in the following statement: "[s]o there has to be some agreement, some compromise, between one and five. And I believe that two would be a good number. I do not believe we should just settle for one." *Id.* at 763. Councilwoman Specter left little doubt as to the arbitrariness of the two percent figure:

> We didn't do a study to see whether or not ten percent was proper for women or the percentage for minorities was correct. We know there were a lot of wom-

en out there and a lot of minorities out there and they weren't getting their share. And we set a goal. And it was pretty arbitrary. And we sought to encourage. *And that's what this does.* (emphasis added).

*Id.* at 751. In addition, Sanford Hines warned that establishing anything greater than a one percent set-aside when there is an insufficient number of qualified HBE's to perform that work will only serve to promote fraud rather than the development of legitimate HBEs.

Whether the testimony is characterized as demonstrating no evidence of the number of HBEs that could realistically benefit by the two percent set-aside or as providing proof that there cannot possibly be sufficient HBEs, nothing stated at the September 27, 1988 hearing indicates that the city had established a rational basis for its choice of a two percent set-aside. Should the city, at some later date, be able to demonstrate that there has been prior discrimination against HBEs in the city procurement process, and show that there are a specific number of handicapped businesses, existing or in the formation stage, that could realistically perform a given percentage of city contracts, a set-aside program established under those circumstances would withstand the rational basis test. The city council actually conceded that the choice of the two percent number was arbitrary, indicating to the court that there is no rational relationship between the city's conclusion that there exists unjustified discrimination against the disabled and the city's establishment of a mandatory set-aside of procurement contracts to eradicate that discrimination. Accordingly, the HBE set-aside fails to withstand the level of constitutional scrutiny applicable to classifications based on handicapped status, and must be struck down.

*4. The Regulations*

Plaintiffs also challenge the constitutionality of the Regulations adopted by the MBEC under § 17–504(e) of the Ordinance. These Regulations must fall for the following reasons. Firstly, as discussed above, the court will strike down the Ordinance

creating the MBEC. Secondly, the Regulations were devised to implement the Ordinance, and thus inseparably linked to it. Because the Ordinance will be declared unconstitutional, these Regulations cannot stand.

■ Thirdly, the "sheltered market," not in the Ordinance proper but lurking in the Regulations, is suspect by its terms. It has the potential for mischief and cannot stand. As stated above, *see supra* p. 1280, the "sheltered market" program established by the MBEC Regulations enables the city to reserve certain contracts for bidding *only* by D–MBEs, D–FBEs and D–HBEs. This "sheltered market" program exists in addition to the fifteen, ten and two percent set-asides created by the Ordinance. Moreover, the Regulations do not limit the number or dollar amount of city contracts that may be reserved for the sheltered market. The program thus vests unnamed city officials with totally unbridled discretion to discriminate on the basis of race, gender or handicap by placing city contracts in this sheltered market. For the reasons discussed above in subsections one, two and three of section "D" of this opinion this program is blatantly unconstitutional. The record before the court did exhibit some evidence, albeit insufficient, attempting to justify the establishment of the set-asides, however, the city has not offered even the slightest justification for this independent sheltered market principle. Examined in light of the burden placed on the city by the *Croson* decision, the sheltered market concept in the MBEC Regulations is a resistible force on a head-on collision course with an immovable object—the Equal Protection Clause of the United States Constitution—and consequently cannot survive.

## IV. CONCLUSION

The Supreme Court's decisions on affirmative action during the last decade have left the lower courts with a mixed bag of principles, standards and rules that must be sifted through to determine the proper course to follow in determining constitutionality. Those in government charged with legislating a constitutional course in their many endeavors understandably view constitutionality as a moving target and, thus, it is not good ground for criticism that the target was missed. Despite the ambiguity frequently cited by lower courts, *see Shurberg Broadcasting*, 876 F.2d at 910; *Milwaukee Co. Pavers*, 707 F.Supp. at 1021–22, *Croson* sent a dramatically clear message. The *Croson* decision did not completely bar the institution of race-conscious programs designed to change ingrained patterns of discrimination in certain industries. What it plainly did was to place a heavy burden on the locality to prove that the program was strictly remedial. In its wake, many local set-aside ordinances have been enjoined or ruled unconstitutional. *See e.g., Michigan Road Builders Ass'n, Inc. v. Milliken, supra; The Cone Corporation v. Hillsborough Co., supra; Milwaukee Co. Pavers Ass'n v. Fiedler, supra; American Subcontractors Ass'n, Georgia Chapter v. Atlanta*, 259 Ga. 14, 376 S.E.2d 662 (1989).

Having examined the entire legislative record of Chapter 17–500 of the Philadelphia Code, this court finds that the race- and ethnicity-based set-asides in the Ordinance suffer from the same evidentiary defects as the Richmond Plan. It was a lack of specific identified evidence of prior systematic discrimination by the enacting body in the relevant industry that led the *Croson* court to overturn the Richmond Plan. The absence of such evidence from the legislative history of Chapter 17–500 and the striking similarity between the two set-aside programs prevents this court from distinguishing the Ordinance and its Regulations from the Plan invalidated in *Croson*. This court holds, as a matter of law, that the MBE set-aside in the Philadelphia Ordinance and the implementing Regulations violate the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and accordingly the court will grant summary judgment in favor of the plaintiffs.

As stated previously in this opinion, *Croson* was limited to a discussion of the appropriate standard of review of race- and

ethnicity-based classifications. This court concludes that the reasoning of the Supreme Court in combination with the level of review announced in other cited Supreme Court decisions can be compared and applied to arrive at an appropriate standard of review to evaluate gender- and handicapped-based classifications as well. As a matter of law, for the reasons discussed above, these gender- and handicapped-based classifications must also be invalidated as violative of the Equal Protection Clause, as they are not supported by adequate evidence even when held to lesser levels of review. Accordingly, the court will also grant summary judgment in favor of the plaintiffs with regard to those portions of the Ordinance.

An appropriate Order will be entered.